Merrimack,
Dec. 4, 1945. } No. 3509.

EVERETT G. PERKINS & *a.*

*v.*

PUBLIC SERVICE COMPANY OF NEW HAMPSHIRE & *a.*

*Robert W. Upton* (by brief and orally), for the plaintiffs.

*Sulloway, Piper, Jones, Hollis & Godfrey (Mr. Hollis* orally), for the defendants.

PAGE, J.   The first position of the plaintiffs is that they are entitled to the value of their stock unaffected by the liquidation impending when they bought it.   They assert that this position was ignored and not considered by the Master.   The finding was made that the testimony placing a value in excess of $115 a share, the call price, "together with the suggestions in the ingenious briefs for the plaintiffs, does not carry convincing power equal to the weight of the evidence of the actual sales. . . ."   This indicates that the Master did consider the claim of the depressed value and weighed it against the evidence of actual sales.

The plaintiffs excepted to the finding that "the best ascertainable value of the stock in question on August 8, 1936," was not exceeding $101 a share plus dividend at 8 per cent per annum from the last dividend day.   The main complaint made to this finding is that the Master ignored certain factors which properly enter into best ascertainable value.   The plaintiffs made specific requests for findings that the property value of the power company, its earning capacity, its capitalization, and certain other factors were existent, most of which were denied.   It is asserted that these factors bear on the best ascertainable value of the stock.

The assumption by the plaintiffs that the Master "gave no consideration to the factors" and to the evidence concerning them is not to be accepted.   On the other hand, we do assume, as the defendants assert without contradiction, that able counsel for the plaintiffs, in his trial brief, plainly and in some detail urged these very factors and

this very evidence, so that when the Master stated that he had weighed the brief and decided as he did because of factors he considered more persuasive, he in effect found that he had considered the factors that it is now claimed he ignored.

A consideration of the specific requests that were denied, subject to the plaintiffs' exceptions, must be made in the light of the fact that any of them, if made, would have resulted only in statements of evidence to be considered and weighed against other evidence bearing on the issue of value. They could not, as a matter of law, determine the value of the stock. If they were considered and weighed, as they appear to have been, that is all that the plaintiffs had a right to claim.

Most of the requests for findings were properly denied, in any event, since the record did not compel them as a matter of law. These are:

(1) The request that the assets back of this preferred stock were equivalent to about $200 a share. Upon analysis of the testimony, it appears that the request was based upon the assumption by a witness (which the Master was not compelled to adopt) that the power company's statement of book value of the assets represented real value. Then a further assumption was made, which has elements that the Master was clearly warranted in rejecting. It was assumed that this book value, less depreciation reserves and bonded indebtedness and bank loans, was available for the preferred stock. In consequence, the plaintiffs urged the division of the assumed net of $742,232 by 3,680 (the number of preferred shares), which would result in the "ascertainment" that there was property worth $200 behind each preferred share. The materiality of such a finding might be doubted because of its misleading character. The property, whatever its worth, was back of the common stock also, and there was so much common stock as to make the book value of the assets findably less than $100 a share for all the stock. But such misleading phases of the question apart, it is important that the very witness on whom the plaintiffs rely for the $200 figure testified that the power company had not taken sufficient depreciation; that the taking of proper depreciation and other adjustments would have left the company with a deficit of nearly $3,000. A showing that a corporation is possessed of property ample to back its preferred stock at more than par, while insufficient to back its common stock at par, doubtfully argues for a preferred stock value at a large premium. In any event, the testimony concerning improper de-

preciation, if credited, would disturb the plaintiffs' figuring rather devastatingly.

(2) The request that dividends on the preferred stock were regularly paid was in substance involved in the actual finding that they "were regularly declared and promptly paid." The further request, that they were earned in recent years by a wide margin, rested on testimony that in 1933 the net income was 2.4 times the dividend requirements, in 1934 about 2.07 times, and in 1935 about 1.7 times. These ratios all depended upon the correctness of the company's statements. But the witness who, at the plaintiffs' request, made the calculations mentioned, also testified that if the company had accrued depreciation properly, the ratios would have been 1.8, 1.5, and 1.06, quite another story.

(3) The request that the net income of the power company after interest on the funded debt was $71,115.87 in 1933, $60,916.04 in 1934, and $50,007.77 in 1935. On the face of the company's statements, the findings would have been compelled. Whether they represent realities, as already noted, is open to doubt.

(4) Desired to cushion the effect of the apparent loss, from 1933 to 1935, of 30 per cent in net income and the feared result upon a large premium value for the plaintiff's stock, was a request that the 1935 reduction was due to an extraordinary charge of $10,251.90 in the merchandising department. This request relates to an important subsidiary fact to be considered as evidence. The loss was serious unless it was in fact extraordinary and non-recurrent. It was testified that the charge was not necessarily of the latter nature. As a matter of fact, the original statement of the power company to the Public Service Commission included this item as a charge against "Other Operations Mdse Dep't." That item was findably, by a later correction, erased, and the $10,251.90 was added to "Operation and Maintenance — Electric."

(5) The request that interest charges amounted to $44,000 a year, which had to be deducted before ascertaining net earnings available for dividends. This was a fact, but it was inconsequential to the plaintiffs unless that charge for interest might be decreased, with resultant increase of the net income available for dividends. So a finding was requested that when the bonds matured in 1943, they might have been refunded at a lower rate of interest. The Master might well have refused to consider, as to the 1936 value, remote possible events in 1943, which as it turned out never could affect the value of this stock. Compare *Gregg* v. *Railroad,* 67 N. H. 452,

453. Since "might have been" is not equivalent to a probability, the finding, even if made, would hardly be useful. But in any aspect the Master was justified in denying the request, in view of the evidence that net earnings were decreasing substantially and that, on the basis of proper accounting, a deficit had already occurred before the merger. A reasonable trier of fact could have doubted that any materially better financing would have been possible in 1943; indeed he might equally have prophesied that the maturity of the bonds was likely to be the occasion for a foreclosure of the mortgage, with consequent ill effects on the value of the preferred stock, rather than benign ones. The best that could be said for the request, on all the evidence, was that the conclusion urged represented one of two possible guesses into an unknown future that never arrived.

(6) That the funded debt was about 40 per cent of the book value of the assets, a favorable ratio. While there was some little conflict of evidence as to the precise percentage, the important point is that it was a matter of judgment whether the ratio was favorable, and the Master's judgment could not be compelled.

Two requests (that the properties were in reasonably good shape and that gross revenues increased largely from 1926 to 1935) on their face might seem to be compelled. But however that may be, their denial could not result in error. The former fact, if found, would be an element to be considered in appraising the property. But there was no evidence of property value, only a mere assumption that book value was true value. An estimate of value on such an assumption, without even opinion evidence of value, could not be accepted. *Homer* v. *Company*, 155 Md. 66, 82. In view of the proper denial of the request for an explanation of recent decreases in net income, the finding as to increased gross income would have no significance.

One of the findings to which the plaintiffs excepted was that "Mr. Perkins says he was not aware of its existence [the pendency of the liquidation], which, if true, establishes that the price he paid was not depressed thereby." His testimony may be taken as true, since it was peculiarly within his knowledge. Compare *Harlow* v. *Leclair*, 82 N. H. 506. He was a broker of long experience, specializing in utility stocks, and he says that he paid a fair price, $101, on the belief that he was buying into a going concern. But the plaintiffs except to a further finding: "It stands to reason that if he was not aware of the pendency of the proceeding before the commission,

that the officials of the bank from whom he purchased were also ignorant thereof, as he was a member of that bank and had sold it a great many securities, and sold many for it." If this is a *non-sequitur*, it is enough to remark that if the contrary knowledge of the officials of the bank were a fact that depressed the price acceptable to them, that fact cannot be assumed in behalf of the party who has the burden of proof and fails to sustain it.

The plaintiffs excepted to the finding that Mr. Perkins would naturally become familiar with the pendency of liquidation, that his testimony that he did not know of it is quite incredible, and that if he knew, the officers of the bank from which he purchased must also have known. If the finding is unsupported by evidence and ought to be totally disregarded, there still remains no evidence on the record that the plaintiffs purchased at prices depressed by the pendency of proceedings for liquidation. It is not enough that the plaintiffs introduced evidence of a general tendency of such proceedings to depress market prices. They had the burden of showing that that was what happened here. They must prove causal connection between the supposed cause and the actual prices at which they bought.

The only evidence plainly is, as to Mr. Perkins, that he bought without knowledge of the supposedly depressive influence. The plaintiffs did not see fit to offer any evidence as to the state of mind of the officers of the seller. The broker who sold to Mrs. Spaulding at $100 a share testified clearly that he did so in ignorance that liquidation was pending; that he thought he was selling stock in a going concern, else he would not even have offered it to her. The only possible conclusion so far is that he offered it at a fair price in an undepressed market. Mrs. Spaulding and her representative did not testify as to their state of mind. There was evidence of two other contemporary sales at $101 a share. Nobody testified as to whether the purchasers or sellers knew of the pending liquidation. And there was no evidence of market quotations of this stock which by any stretch of the imagination could be assumed to be affected by any tendency to depression arising from general knowledge of the pending liquidation, or with reference to which the parties to any of these sales could have arrived at the agreed prices.

The plaintiffs, as to these matters, had the burden of proof. All they did was to show that some brokers, who as far as appears made no purchases or sales, had knowledge of the pendency of liquidation, and that such knowledge tends to depress prices when sales are made, but they did not bring forward any bit of evidence tending to show

that any sale testified to was thus affected.   Since the supposed cause was without effect, it is immaterial that there is a depressive tendency in known liquidation.

However erroneous the finding based upon the supposed incredibility of Mr. Perkins' testimony, it would be improper to order a new trial under the existent circumstances.   The plaintiffs have excepted to the failure of the Master to find that Mr. Perkins did not know of the impending merger when he bought.   By both that and the exception to the finding of incredibility, they stand upon complete belief in Mr. Perkins' testimony.   There they may be left, without proof of anything that actually caused them to pay depressed prices.

The plaintiffs excepted to the finding that the sale to Mrs. Spaulding was between a willing buyer and a willing seller.   The principal reason for this exception is that the broker who sold her the stock at $100 a share had bought it at $98.75 when it came onto the market "as a cleanup of under-water collateral loans."   To the denial of a request to find the latter fact, the plaintiffs also excepted. Concerning Mr. Perkins' purchase, the plaintiffs have an exception to the denial of their request for a finding that the bank that sold to him had acquired the stock on the calling of a note upon which the stock was collateral, and that the stock was not a legal investment for the bank.   These factors seem to be wholly independent of the notion of a market depressed by pending liquidation.   They apparently were urged earnestly on the Master as depressive influences upon the prices paid by the plaintiffs.   But those factors were considered, as were other factors urged in the plaintiffs' trial brief. And they were balanced against other evidence, as of other sales at which $101 was the highest price obtained, as the Master specifically found.   It was the Master who alone had the function of weighing these factors.

The plaintiffs urge that "the lien of the preferred stock upon the assets was determined by the call price of 115."   This overlooks the provision of the charter that the stock could be called and retired in this manner only by action of the power company when it planned to continue as a going concern.   It further overlooks the fact that in case of the winding up of the company and the liquidation and distribution of its capital, the charter provided that the lien of the preferred stock should be $100 a share.   The preferred stock was never called, but was liquidated along with the other capital stock. If the preferred stockholders are entitled to more than par as the

best ascertainable value of stock taken by eminent domain, it is by virtue of the statute and not by virtue of any lien created by the charter-contract.

The findings as to the value of the plaintiffs' stock may stand. All exceptions thereto are overruled.

The plaintiffs excepted to the finding that the defendant power company made a good tender to the plaintiffs when, on August 8, 1936, they notified them that they could have $100 a share plus accrued dividends to August 27, by presenting their certificates for cancellation at the Old Colony Trust Company and drawing against a deposit of that amount there made under an irrevocable trust. If this tender were refused solely on the ground that the amount was insufficient, informality of tender, if any, was waived. *Brown* v. *Simons*, 44 N. H. 475, 477. On November 12, 1940, counsel for the defendants notified counsel for at least one of the plaintiffs (Mr. Perkins) that in exchange for the certificates, the Old Colony Trust Company would pay over so much of the deposit as related to those certificates, but without prejudice to the stockholder's right to receive more after the determination of the amount to which he was entitled. If any informality were waived in 1936, failure to claim the money so offered, without any complaint as to the form of tender, was a further waiver of any informality as far as the plaintiff Perkins was concerned. The claim was then in litigation, and counsel was as proper a person to make the offer to as was the client. Even if the attorney had no authority to accept the offer without consulting his client (5 Am. Jur. 300), all that was necessary, in order to stop interest running on the sum on deposit at the Old Colony Trust Company, was that the client should know that he could take that sum without prejudice to his right to recover more. We think that this case should be treated on principles of notice. See *Butler* v. *Morse*, 66 N. H. 429, 431, where the authorities cited sustain the view that notice to the attorney is notice to the client, and binds him, when the notice is in the course of the transaction in which the attorney is acting for him. The rule rests upon the equitable notion that failure by the party so notified to act within his power to act throws the burden upon him and not on the contrary party.

The situation with reference to the running of interest is a particularly apt one for the application of the rule. This is a petition in equity. The defendant power company had created a trust fund in the hands of a trustee whose responsibility is not questioned.

The fund was in part for the benefit of the plaintiffs. The defendants could not, as far as appears, share the benefit under any conceivable circumstance. The plaintiffs could rightfully decline to take the benefit of the trust if the fund were inadequate. If they did so decline, for that reason, any informality in the "tender" other than that of amount was waived. Being so waived, the only question outstanding between the parties was the value of their stock and the interest payable. When the plaintiffs knew that they could draw on the trust account to the full amounts deposited for their benefit without waiver of their right to collect more, the equitable rule required that their failure so to draw within a reasonable time should throw the future interest upon the plaintiffs to the extent there were sums available, and no longer upon the defendants to whom they were not available.

The strict legal rules of tender depend upon the theory that when a debtor puts it in the immediate power of the creditor to receive legal-tender money sufficient to pay the whole debt, the debt is extinguished, whether the creditor accepts or refuses the tender. There is also the consequence that if less than the amount due is offered and accepted, the debt is extinguished. Since a creditor is under no obligation to accept less than is due, ordinarily a tender of less, if refused, has no legal significance whatsoever. But in equity the rules of legal tender at law yield in some instances. There is no rule in equity that a tender should be kept good by bringing the money into court. Readiness and willingness to pay are sufficient in equity, once the opportunity of the creditor to accept has been ignored. 52 Am. Jur. 237. In the case of the plaintiff Perkins, if not of the plaintiff Spaulding, there can be no doubt of the readiness and willingness of the power company that he should have the fund deposited against his stock without any waiver of his rights to recover more. Thus his legal risk of acceptance was avoided. If it be assumed, for purposes of example merely, that his stock were worth $118 a share, there would be no question that if he took the $100 deposited and accrued dividend in November, 1940, interest would equitably stop on that amount, but would continue to run on the $18 until the date of payment. If he insisted upon, and received, the interest upon the full amount from November, 1940, five years, he would be collecting $30 on the $100 as a penalty for not receiving the $18 and interest thereon to November, 1940, and yet he would get the $18 and interest anyway. To state the forfeiture is to describe it as inequitable. Proportionally the claimed penalty would

increase rapidly with the decrease of the best ascertainable value below $118 a share. The postponement of the payment of $100 a share and dividend beyond November, 1940, was attributable entirely to Mr. Perkins, and perhaps also to Mrs. Spaulding. See *Luckenback &c. Company* v. *United States*, 272 U. S. 533, 542. Consistently with this view, the Master ruled that failure of the plaintiffs to object to the manner of the tender was a waiver of a better method and constituted laches.

Accordingly, if it be found that Mr. Perkins declined settlement in August, 1936, solely because of inadequacy of the funds made available, interest in his favor on the full amount due on his stock will run from August 27, 1936, to such date after November 12, 1940, as shall be found reasonable for his action. Thereafter interest will run only on the excess of the amount found due over the amount then available to him. The interest due to Mrs. Spaulding will be figured on like principles. Whether or not the letter of November 12, 1940, was notice to her sufficient to stop the running of interest may depend upon a finding whether Mr. Upton was acting as her attorney on that date and the letter was on its face intended to include her in the notice.

*Case discharged.*

All concurred except MARBLE, C. J., and JOHNSTON, J., who dissented on the ground that the Master's report did not sufficiently indicate a consideration of the plaintiffs' requests for findings and on the further ground that there was no effective tender or waiver thereof.