In the Matter of the Application

of

GENERAL REALTY & UTILITIES CORPORATION, a Delaware corporation, the surviving corporation under an agreement of merger for an appraisal pursuant to Section 61 of the General Corporation Law of the State of Delaware of the value of certain shares of its formerly authorized preferred stock.

*New Castle, March 26, 1947.*

482

*Aaron Finger* of the firm of Richards, Layton and Finger, (Leonard P. Moore, of Chadbourne, Wallace, Parke & Whiteside, of New York City, of counsel), for General Realty & Utilities Corporation.

Morris, Steel, Nichols & Arsht, and Unger & Pollack, of New York City, for the stockholders.

SEITZ, Vice-Chancellor: The issue here is whether the appraiser committed error in arriving at his determination of the value of the dissenting stockholders' shares made pursuant to our present appraisal statute.

As a consequence of a merger between General Realty & Utilities Corporation and its wholly owned subsidiary Gruco, Inc., both Delaware corporations, certain owners of preferred stock of General Realty & Utilities Corporation dissented and requested an appraisal of their shares. Pursuant to the provisions of our appraisal statute, *Section 61, Rev.Code 1935, § 2093*, as amended by 43 *Del.Laws, c. 125*, § 6, this court appointed an appraiser to determine the value of the dissenters' shares as of September 30, 1944, exclusive of any element of value arising from the expectation or accomplishment of the merger. A great amount of testimony was presented to the appraiser and many exhibits were marked in evidence.

The appraiser was authorized by order of the court to submit a draft of his report to the parties and to permit them to file exceptions thereto, and then to file his final report. The appraiser submitted to the parties a draft report of his appraisal wherein he found a value of $110 a share for the preferred stock. After considering exceptions filed by the stockholders, a final report was filed with the court

setting a value of $120 a share on the preferred stock. While the General Realty & Utilities Corporation (hereinafter referred to as "the Corporation") did not file exceptions to the draft report, it did file exceptions to the final report of the appraiser. The dissenting stockholders filed exceptions to the draft report and also to the final report of the appraiser. Certain other dissenting stockholders who filed exceptions to the appraiser's draft report have not filed exceptions to the final report.

This constitutes the decision on the exceptions of certain dissenting stockholders and the Corporation to the appraiser's final report.

The appraiser's final report numbers 116 pages and narrates in great detail and with great clarity the problems considered and his conclusions with respect thereto. The nature of the exceptions can be better understood by first considering the undisputed material facts as they appear in the appraiser's report, and then quoting his final conclusion with respect to the value of the shares.

The Corporation was incorporated in January, 1929, with its principal office in New York City. At the end of 1929, the Corporation had outstanding 294,200 shares of $6 cumulative preferred stock (dividends at option of stockholder could be taken in common stock at specified rates) and 1,544,515⅞ shares of common stock. The preferred stock had been given a stated value of $100 a share and the common a stated value of $5 per share.

The original plan of the Corporation's business activities called for the making of loans for the construction of buildings, the purchase of property for resale, the erection of buildings for investment or resale, and related activities. Shortly after the commencement of business, the financial depression in the early 1930's brought about a situation whereby there was a cessation of building and no need for building loans. Neither was there any real market for the

resale of the properties acquired by the Corporation. Thus, from that time to the present the Corporation's business has consisted chiefly of owning, holding and operating office buildings, apartment houses, store properties and hotels, mostly in New York City, although there is one property in Boston and one in Kansas City. In addition, the Corporation owns certain unimproved property in New York City. The various properties were held in the name of separate corporations subsidiary to the Corporation.

The income of the Corporation consists of the income from these various operations.

At the merger date no dividends on the preferred stock had been paid since 1931, except for a single $6 payment in 1943. The dividends in arrears on the preferred stock on July 15, 1944, just preceding the merger, aggregated $72 per share.

The following is a summary of the net income of the Corporation and the amount of dividends paid on the preferred and common stock from 1929 to September 30, 1944, the end of the fiscal year:

| | Net Income | Dividends Paid— Preferred | Dividends Paid— Common |
|---|---|---|---|
| †1929 | $3,480,611 | $4.50 or 9/40ths Common | none |
| 1930 | 4,287,965 | $6. or 12/40ths Common | none |
| 1931 | 1,246,776 | $4.50 or 3/40ths and 6/50ths Common | none |
| 1932 *d | 535,031 | none | none |
| 1933 d | 448,442 | none | none |
| 1934**d | 308,050 | none | none |
| 1935 d | 56,621 | none | none |
| 1936 | 107,756 | none | none |

| | | | |
|---|---|---|---|
| 1937 | 193,165 | none | none |
| 1938 | 103,540 | none | none |
| 1939*** | 45,356 | none | none |
| 1940 | 76,115 | none | none |
| 1941 | 61,692 | none | none |
| 1942** | 118,721 | none | none |
| 1943** | 230,570 | $6 or 12/50ths Common | none |
| ‡1944 | 611,428 | none | none |

\* Before giving effect to reductions as a result of appraisal of December 31, 1932, or to net loss from disposition of real estate investments.

\*\* Exclusive of net loss from abandonment of real estate investments charged to reserves previously provided.

\*\*\*Nine months to September 30, 1939.

† Eleven months to December 31, 1929.

‡ Year ending September 30, 1944.

The following is a condensed, consolidated balance sheet, as of September 30, 1944, based on the Corporation's annual report as of that date, but restated to eliminate the effect of the merger and the effect of the conversion of the stock:

### ASSETS

| | | |
|---|---|---|
| Cash per Annual Report | | $ 1,262,086.83 |
| Marketable Securities (Quoted Prices September 30, 1944 $2,279,510.51—Note 3 of Annual Report) per Annual Report | | 2,224,466.56 |
| Due from Renting Agents and Tenants | | 284,691.58 |
| Accrued Interest and Dividends Receivable | | 18,936.88 |
| Real Estate Mortgage Loans Receivable | | 2,638,500.00 |
| Improved Properties:— | | |
| Appraised Values of March 31, 1944 | 21,267,335.00 | |
| Less Depreciation for the Six Months Ended September 30, 1944 | 228,414.63 | |
| | 21,038,920.37 | |
| Mortgages Payable | 15,305,829.69 | 5,733,090.68 |
| Unimproved Properties:— | | |
| Appraised Values as of March 31, 1944 plus subsequent acquisitions at cost | 378,147.57 | |
| Mortgages Payable | 32,580.00 | 345,567.57 |

| | |
|---|---:|
| Furniture and Fixtures—At Cost Less Depreciation | 3,744.42 |

| | | |
|---|---:|---:|
| Prepaid Expenses and Other Deferred Charges per Annual Report | 531,612.46 | |
| Less Debenture Expense Deferred Included Therein (Note 5 of Annual Report) | 92,141.46 | |

| | |
|---|---:|
| Prepaid Expenses and Other Deferred Charges as Adjusted | 439,471.00 |
| Other Assets | 11,368.32 |
| Expenses Incurred in Connection with the Merger and the Conversion of Capital Shares (Note 1-G of Annual Report) Restored for the Purpose of this Statement | 122,855.28 |
| Total | $13,084,779.12 |

### LIABILITIES

| | | |
|---|---:|---:|
| Accounts Payable and Sundry Creditors | | $  190,766.55 |
| Accrued Liabilities | | 469,176.65 |
| Deferred Income | | 7,859.60 |
| Reserve for Taxes and Contingencies | | 600,000.00 |
| Capital Shares and Surplus—Restated to Eliminate the Effect of the Merger and of the Conversion of Capital Shares (Note 1-F of The Annual Report) | | |
| Preferred Stock — 111,000 Shares of A Stated Amount of $25.00 a Share | $2,775,000.00 | |
| Common Stock—1,544,702.88 Shares of A Par Value of $1.00 a Share | 1,544,702.88 | |
| Surplus | 7,497,273.44 | |
| Total Capital Shares and Surplus | | 11,816,976.32 |
| Total | | $13,084,779.12 |

Therefore, on the basis of the values set forth in the Corporation's annual report, we find the following per share book value of the preferred stock at the merger date:

| | |
|---|---:|
| Total Capital Shares and Surplus | $11,816,976.32 |
| Number of Preferred Shares Outstanding | 111,000. |
| Book Value Per Share | $      106.46 |

The market quotations for the preferred stock, which was traded on the New York Stock Exchange, ranged from a low of $5 per share in 1932 to a high of $90.50 in 1944.

After considering and discussing the voluminous and often conflicting testimony which was introduced to show the asset value and potential earning capacity of the Corporation, the appraiser set forth his general conclusion in the following language:

### "Conclusion

"As was stated near the beginning of this Report, in appraising stock of a corporation whose assets are about one-third in cash and in marketable securities and about two-thirds in real estate equities, the net asset value of the corporation seems to be by far the most important consideration. However, even in the case of a corporation such as this, as distinguished from those whose principal resources are its patents and goodwill, the *liquidating* value of the stock is not the *sole* basis for an appraisal of its intrinsic worth, if we assume that the Company is justified in staying in business. By holding the component parts of the Corporation together, it is presumed that they will be worth more, because of the income which together they produce, than could be realized from them in liquidation. But, it certainly cannot be said that the intrinsic value of any shareholder's interest in a going Corporation at a given time is *less* than he could realize for it upon a liquidation of the Corporation's assets at that time. If that be the situation in any Corporation, surely its time for liquidation has arrived.

"The value at which I have appraised the stock of General Realty & Utilities Corporation on the basis of the net assets of the Corporation at September 30, 1944 (129.61), is not an appraisal of the liquidation value of the stock. In the first place, the individual assets were not evaluated by me on the basis of what they would have brought if sold on September 30, 1944. I am doubtful whether many of them could have been sold then for prices as high as my appraisals. Moreover, the expense of liquidating them would have been substantial.

"I have set forth herein my estimate of what the earnings of this Corporation would be for the years immediately following the merger. Because of its enlightened management and character of the Corporation's present holdings, I believe, as heretofore indicated, that in the more distant future its net income will increase substantially. Its Unimproved Properties seem to me to be potential locations for profitable enterprises.

"On the basis of my appraisal of the value of the net assets and my estimate of the prospects, on September 30, 1944, for income in the future, and, after giving what seems to me to be proper weight to each of those elements and some weight to the stock market quotations, my appraisal of the value of the preferred stock of General Realty & Utilities Corporation on September 30, 1944, is $120.00 per share.*

\* \* \* \* \*

"\* This is an increase of $10.00 per share over the appraisal stated in my Draft Report. The increase results from the increased evaluation of 285 Madison Avenue, the elimination from the liabilities of the reserve for taxes, and the giving of greater weight to net asset values."

Since this is the first hearing before the court under the appraisal statute as amended in 1943, it might be well to discuss generally the function of the court in passing upon exceptions to an appraiser's report. So far as here pertinent, the statute provides:

"After the hearing of such petition the Court shall determine the shareholders who have complied with the provisions of this section and become entitled to the valuation of and payment for their shares, and shall appoint an appraiser to determine such value. Such appraiser shall have power to examine any of the books and records of the corporation the stock of which he is charged with the duty of valuing, and he shall make a determination of the value of the shares upon such investigation as to him may seem proper. The appraiser shall also afford a reasonable opportunity to the parties interested to submit to him pertinent evidence on the value of the shares. The appraiser, also, shall have such powers and authority as may be conferred upon Masters by the Rules of the Court of Chancery or by the order of his appointment.

"The appraiser shall determine the value of stock of the stockholders adjudged by the Chancellor to be entitled to payment therefor and shall file his report respecting such value in the office of the Register in Chancery and notice of the filing of such report shall be given by the Register in Chancery to the parties in interest. Such report shall be subject to exceptions to be heard before the Court both upon the law and facts. After hearing exceptions to the said report the Court shall by its decree determine the value of the stock of the stockholders entitled to payment therefor \* \* \*."

It is apparent from the language employed that the appraiser is akin to a master in Chancery. While this court must ultimately determine the facts and law in the sense that its decree finally determines the value of the shares, nevertheless, the court must accord some weight to the appraiser's report, otherwise his function would degenerate almost to that of an examiner. The approach taken by the New York Court in *Application of Behrens, Sup.*, 61 *N.Y.S. 2d* 179, 182, which involved exceptions to an appraisers' award has much to commend it as a partial test to be employed by this court in considering exceptions to an appraiser's award under our statute. The New York court said:

> "This statement of the views of the parties, in which they differ 100% in the conclusion of value to be drawn from agreed facts, indicates the wide latitude for judgment which may exist in an appraisal proceeding and why the report of appraisers should be accepted if it is altogether responsive to legal requirements. The Court is obliged, however, to review and test the appraisal by legal standards and make such modification as may be dictated thereby."

I propose to accord due consideration to this approach in passing upon the exceptions now before me. See also *Perkins v. Public Service Co.*, 93 *N.H.* 459, 45 *A.2d* 210, 213.

While the dissenting stockholders have taken several exceptions to the appraiser's report, it is apparent that from an over-all view they purport to give reasons why the appraised value of $120 per share is inadequate. The reasons for their conclusion as set forth in their exceptions may be summarized:

(1 ) The appraiser considered the values as set forth in the Brown, Wheelock, Harris, Stevens, Inc. (hereafter called "Brown, Wheelock") appraisal submitted by the Corporation and made as of March 31, 1944, when the value of the stock was required to be ascertained as of September 30, 1944. Moreover, the appraiser considered the Brown, Wheelock appraisal made as of an earlier date even though he had before him the so-called Benton appraisal submitted by

the dissenting stockholders and made as of September 30, 1944—the crucial date.

(2) The appraiser erred in giving weight to market value in arriving at his result, since no fair market value existed on September 30, 1944, because the market was depressed by news of the merger.

(3) The appraiser erred by using estimated future income rather than the actual earnings for 1945 (hindsight evidence) as a factor in arriving at his result because such actual earnings were reasonably foreseeable on September 30, 1944.

Other objections made by the stockholders will not be mentioned since they are relatively unimportant and without merit. The exceptions filed by the stockholders both to the draft report and the final report also indicate that they were demanding interest on the appraised value of their shares from the effective date of the merger. I shall consider this point after disposing of the other exceptions filed by the stockholders and the Corporation.

The first reason advanced by the stockholders as a basis for increasing the appraiser's valuation is without merit. The appraiser discussed and disposed of this reason in his report (pp. 16-16a). The appraiser felt that it was proper to consider the Brown, Wheelock appraisal of the Corporation's assets, even though it was made as of a few months prior to the effective date of the merger. However, he also felt that he was completely free to reject or adjust the values found therein in order to arrive at the value of the shares at the merger date. This the appraiser did. Moreover, the appraiser gave due consideration to the Benton appraisal submitted by the stockholders. I am in entire accord with the appraiser's approach and conclusion on this point. The appraisal statute gives the appraiser great latitude in seeking evidence from which he may ascertain the value of the shares to be appraised.

The second reason advanced by the stockholders is to the effect that the market value of this Corporation's shares should not have been considered in arriving at a determination of value because no fair market value existed at or about the effective date of the merger. In my opinion, this contention is not supported by the evidence. The preferred stock of this Corporation was listed on the New York Stock Exchange and, while not traded in large amounts, it was bought and sold almost daily. Nor can I agree that news of the proposed merger depressed the market value of the shares. One can infer just the contrary from the record. The appraiser did not commit error in concluding that a fair market value existed and using such value as one factor to be considered in arriving at the appraised value of the shares.

The third reason advanced by the stockholders was answered in the following language taken from the appraiser's report (p. 46a) :

"The Stockholders complain because my estimate [of future net annual income] is not higher (Exceptions 4 and 6 (a) ). They point to the rent rolls as of May 1, 1945 (the records of the rents under the leases for the year May 1, 1945—May 1, 1946), which indicate a probable net income for that year in excess of my estimate, and they argue that such rents were foreseeable on September 30, 1944, and should be used as a basis for estimates of future income. The Stockholders make a similar contention regarding each of the improved properties located in New York City.

"The Stockholders here overlook the principle that, not the immediate prospective income but the average to be expected over a reasonable period of time must be the guide to be followed in making an appraisal. As is explained by Graham & Dodd in their work, 'Security Analysis', Page 432, the stock market valuations are influenced appreciably by prospects for immediate increase and decrease in income; but the long-range prospects furnish the sound bases for sound valuations.

"Obviously, the Stockholders would not have urged the 1945 figures as the sole basis for future income estimates, if, instead of having been a peak year, 1945 had been an unusually poor one for rental incomes."

In other words, the existence of evidence showing actual earnings immediately subsequent to the merger date to be in excess of the estimated future earnings calculated on the basis of long-range considerations does not render erroneous the use of the estimated earnings as a factor in ascertaining the value of the shares. I do not feel that the appraiser committed error here in determining the estimated future earnings on the particular properties, even though such estimates may be below the actual earnings for the year immediately subsequent to the date of the merger. The question as to whether the higher earnings were reasonably foreseeable at the date of the merger, even if of controlling importance, has been fairly resolved against the stockholders.

Let us now consider the exceptions filed by the Corporation. While the Corporation has also filed numerous exceptions, it is apparent from its brief that it relies on three alleged errors committed by the appraiser, and these errors may be summarized:

(1) The appraiser improperly refused to recognize an alleged liability of $435,000 appearing on the Corporation's books as a part of a "Reserve for Taxes and Contingencies."

(2) The appraiser erred in that he predicated his conclusion in part on an assumed future yield of 5% on such shares when there was no evidence to support such a high yield rate.

(3) The appraiser committed error in valuing the stock at $120 per share since that value indicates that he gave undue weight to asset value and insufficient weight to such other factors as the market value and the value based on estimated future earnings and dividends.

The first alleged error of the appraiser consists of refusing to recognize a liability of $435,000 appearing on the Corporation's books. The appraiser's report disposed of this point in the following manner:

"The remaining $435,000.00 of this reserve is for possible Federal Income Tax liability.

"The only testimony on the subject of the tax reserve was given by Mr. Fox, Treasurer of General Realty. He said that the reserve had been set up to meet a possible tax liability for the years 1942-43, but that no assessment had been made. His testimony was given in August of 1945 (Ex. S. 5 A, Pp. 60 and 61).

"This reserve was carried only in the amount of $135,000 on September 30, 1943. It was evidently increased by $300,000.00 in the fiscal year ended September 30, 1944. No Federal Income Tax was paid during the year ended September 30, 1944 (S. 7D, P. 4, and Statement 2, P. 2). It would seem, therefore, that some of the reserve was for possible tax liability for the year ended September 30, 1944.

"No reason for setting up the reserve, except the bare statement of Mr. Fox, supra, has been supplied to me. As late as January 7, 1947, I called attention to the lack of evidence regarding it, and indicated that I should be unable to treat it as a liability unless more evidence should be produced. The Company responded that it had no further evidence on the subject which it desired to produce.

"In making my appraisal of the net asset value of this Company, I have no basis for treating this reserve as a liability."

### Of this refusal, the Corporation states in its brief:

"Between the filing of the draft report and the final report, the Appraiser excluded as a liability $435,000 which appeared on the Corporation's books as part of a 'Reserve for Taxes and Contingencies'. There was no proof that such a liability on the books of the Corporation was not a proper item, no proof that the officers and directors of the Corporation did not exercise proper business judgment and discretion in establishing such a reserve, and the dissenting stockholders failed to produce any proof before or after the draft report showing that such a reserve had not been properly set up."

While it is doubtless true that the appraiser would be required to give weight to the fact that the reserve was presumably set up by the corporate officials in the exercise of proper business judgment, nevertheless, the fact that such a reserve appeared on the books did not preclude the appraiser from concluding that as of the merger date it was not entitled to be treated as a liability for the purpose of valuing the stock of the dissenters. In other words, the facts might

well disclose that the danger sought to be guarded against by the creation of the reserve had disappeared at or before the effective date of the merger. If such appeared, certainly the appraiser would be entitled to conclude that it was not a proper liability in attempting to arrive at net asset value. On the other hand, the mere fact, revealed by hindsight evidence, that it turned out some time after the merger that the reserve was not needed would not in and of itself constitute grounds for concluding that it was not entitled to be treated by the appraiser as a proper liability as of the merger date; otherwise, the asset value of stock being appraised might well turn on the speed with which the appraiser was able to perform his task. Consequently, as I view it, the test in this situation should be whether the reasons for the creation of the reserve still existed at the effective date of the merger, (assuming, of course, that the reasons were entitled to be recognized as possessing merit in that particular business).

Let us examine the record to see whether or not by any reasonable possibility the $435,000 reserve for taxes was justified as of September 30, 1944. The testimony before the appraiser indicates that the entire $435,000 was a reserve for possible federal income taxes for the years 1942-43, and perhaps 1944. The record is not clear as to the status of this matter on September 30, 1944, the merger date, but the testimony indicates that it is not unreasonable to infer that the reason for the creation of the $435,000 portion of the reserve fund was not of sufficient substance at the time of the merger to warrant the appraiser in accepting it as a liability. The Corporation did not desire to clarify the matter, but treated the liability as being *prima facie* valid, with the burden of proof to show the contrary being on the stockholders. The Corporation concludes that the stockholders have failed to discharge the burden imposed upon them. This is hardly a sufficient answer in a proceeding of this type where the appraiser is free under the statute to ascertain evidence of value apart from that supplied

him by the parties. Moreover, information concerning the item here involved, by its very nature, was peculiarly within the domain of the Corporation, and yet it did not see fit to do more than point to the fact that the reserve item appeared in its books. Under the circumstances, that was not sufficient. The appraiser did not commit error in refusing to consider the $435,000 portion of the reserve fund as a liability in so far as the appraisal of the stock was concerned.

The second error committed by the appraiser, according to the Corporation, consists of using a 5% future yield rate when calculating value based on the future earning and dividend rate of the stock. There was allegedly no evidence to support the use of that percentage. After due consideration of the appraiser's report, and the pertinent records and testimony introduced before him, I cannot agree that there was no evidence from which the appraiser could infer a future yield of 5%. The percentage used appears to be somewhat above present averages on preferred stock, but it must be kept in mind that the appraiser was making a long-range prediction for this Corporation and his optimism is not so excessive that it should be characterized as error. While some might be inclined to be somewhat less enthusiastic as to the future dividend prospects of this Corporation, nevertheless, on the basis of recent earnings and future prospects, I conclude that the appraiser did not commit error in using the 5% yield rate.

The third and principal error which the Corporation contends the appraiser committed is that in valuing the stock at $120 per share, he gave undue weight to asset value and insufficient weight to such other factors as market value and value based on estimated future earnings and dividends.

The Corporation contends that even if the appraiser's findings are accepted—market value $90, asset value $129.61, value based on estimated earnings $83—nevertheless, the

ultimate appraised value of $120 per share shows that he erroneously accorded excessive weight to asset value in arriving at his decision. The Corporation points to certain language used by the appraiser in his report which it thinks indicates that he perhaps unconsciously treated the problem largely as a liquidation problem despite his explicit disavowal of any such intent. It cites the following language found in the appraiser's conclusion as evidence of an erroneous preoccupation with liquidating value:

"* * * But, it certainly cannot be said that the intrinsic value of any shareholder's interest in a going Corporation at a given time is *less* than he could realize for it upon a liquidation of the Corporation's assets at that time. If that be the situation in any Corporation, surely its time for liquidation has arrived."

It is well recognized in this state, as in some other jurisdictions, that in determining the value of stock in an appraisal proceeding, the appraiser must not limit his consideration to any one factor, but on the contrary, must consider the numerous cognizable elements involved in "value." *Chicago Corporation v. Munds,* 20 *Del.Ch.* 142, 172 *A.* 452; *In re Fulton,* 257 *N.Y.* 487, 178 *N.E.* 766, 79 *A.L.R.* 608.

The Corporation does not say that the appraiser wrongfully considered a particular value factor, but it says that he gave undue weight under the circumstances to one factor, to wit, asset value.

While the appraiser's report does not set forth the mathematics whereby he arrived at the $120 per share value, it is apparent that it came about almost entirely from the use of the three values found by him, to wit, asset value, market value, and estimated value based on future earnings and dividends. Moreover, in order to arrive at a per share value of $120 it is clear that the appraiser attributed approximately 80% to asset value and the bulk of the remainder to the value based on future earnings and dividends. Thus, asset value appears to have been weighted approximately four times as heavily as value based on pro-

spective earnings and dividends, assuming, as the appraiser stated, that market value and past earning record played little part in his final determination of value.

Was the appraiser warranted under the evidence in according approximately 80% of the ultimate value to asset value? I am impelled to conclude that he was not. It appears that, contrary to the governing law, the appraiser did in fact approach the problem somewhat as though a liquidation were involved. This court indicated in *Chicago Corporation v. Munds, supra,* that such is not the test in cases arising under our appraisal statute. Moreover, asset value, while a factor, must not be over-emphasized in arriving at a determination of appraised value, because other factors such as the value based on prospective earnings are vitally important.

As stated, the appraiser indicated that the "intrinsic value" of a stockholder's shares in a going concern should always be more than their then liquidating value, and if the situation is otherwise, he suggests that the Corporation is a proper subject for liquidation. I cannot believe the appraiser intended to convey the thought that the appraised value of shares under our statute should never be less than their hypothetical liquidating value because such is not the law. As the New York court recently said in *Application of Behrens, supra*:

"Net asset value is entitled to weight, but it must be remembered that an appraisal is not a liquidation, and that the stock must be appraised on a going concern basis (*Matter of Fulton* 257 *N. Y.* 487, 492, 178 *N. E.* 766, 768, 79 *A. L. R.* 608) with the possibility in different cases that the value of the stock may be substantially above or below net asset or break-up value. *National Bank of Commerce v. City of New Bedford,* 155 *Mass.* 313, 315, 29 *N. E.* 532; *Lebold v. Inland S. S. Co.,* (7 *Cir.*) 82 *F.* 2d 351, 356."

Such a result is implicit in the language of the court in *Chicago Corporation v. Munds, supra.* See also *Jones v. Healy,* 184 *Misc.* 923, 55 *N.Y.S.2d* 349, affirmed without

opinion 270 *App.Div.* 895, 62 *N.Y.S.2d* 605; leave to appeal denied 270 *App.Div.* 998, 64 *N.Y.S.2d* 170.

Since I have concluded that the appraiser overweighted asset value, his conclusion as to the appraised value should be revised, and since all the evidence necessary to do so is before me, I see no reason why I should not make the revision rather than either to reject the report or to send it back to the appraiser. *Application of Behrens, supra.*

While possibly no two parties, if given stock to value, would arrive at the same result if they worked independently, nevertheless, I must bring more nearly into line the factors which the appraiser considered. I am inclined to agree with the appraiser that in this type of corporation, which holds properties operated in separate units with little supervision from the Corporation, the asset value factor is more important than in the case of the ordinary commercial business because this Corporation's income is dependent more upon the mere possession of these assets than upon the caliber of the corporate management. However, the dreary earning and non-dividend record of this Corporation cannot be minimized in valuing the shares as stock in a going concern. Nor, in my opinion, was the appraiser entitled practically to ignore market value. I conclude that it would be reasonable here to weight asset value at 50%, and market value and value based on estimated future earnings and dividends each at 25%. When so weighted, the value would be roughly as follows:

| | | |
|---|---|---|
| Net asset value | $129x2 | $258 |
| Market value | | 90 |
| Appraiser's value on estimated future earnings and dividends | | 83 |
| | | 4/$431 |
| | | $108 per share. |

It is the determination of the court that the value of the stock of those stockholders entitled to a valuation of and payment for their shares is to be calculated on the basis of a per share value of $108. Other value factors are not of sufficient importance here to warrant a change in this amount.

The dissenting stockholders have urged in their exceptions that interest should have been allowed by the appraiser on the value of their shares from the effective date of the merger. This court recently decided in *Meade v. Pacific Gamble Robinson Co., ante p.* 406, 51 *A.* 2d 313, (appeals pending) that our appraisal statute as it stood in 1941 did not require the Corporation to pay interest from the date of the merger, but only required the payment thereof from the date when the Corporation was required by the statute to pay the amount of the appraisal. While the 1943 amendments to the appraisal statute were substantial, I can find nothing therein which would require the Corporation to pay interest from the effective date of the merger. Since the appraisal statute as amended in 1943 provides for exceptions to an appraiser's report, it would seem that in cases where, as here, exceptions have been filed, the Corporation will first be obligated to pay when this court enters its decree disposing of the exceptions and determining the value of the stock. Such being the case, the appraiser did not commit error in not adding interest on the appraised value of the shares from the date of the merger.

We come finally to the Corporation's request that the costs be divided equally between the stockholders and the Corporation, presumably on the ground that the dissenters have not acted in good faith. The record fails to support the Corporation's contention, since the mere fact that the stockholders took advantage of the statutory remedy and pursued that remedy with great vigor is not in and of itself evidence of bad faith. Apparently the directors of the Corporation valued the stock at $106.24 per share some six

months before the merger, and presumably would have purchased the dissenter's stock at that price. The dissenters elected to pursue their statutory remedy. Since the appraiser found their stock to be much more valuable than the valuation apparently placed on it by the Corporation, I cannot conclude that the dissenting stockholders were so unwarranted in refusing to accept $106.24 per share that part of the costs should be inflicted upon them. This is so even though I have disagreed with the appraiser's ultimate valuation.

The costs are, therefore, assessed against the Corporation. See *Meade v. Pacific Gamble Robinson Co., supra.*

A decree in accordance with the foregoing conclusions will be advised.