IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| VERITION PARTNERS MASTER FUND LTD. and VERITION MULTI-STRATEGY MASTER FUND LTD., | § § § § | No. 368, 2018 |
| Petitioners Below, Appellants, | § § § § § | Court Below: Court of Chancery of the State of Delaware |
| v. | § § | C.A. No. 11448-VCL |
| ARUBA NETWORKS, INC., | § § § | |
| Respondent Below, Appellee. | § § § | |

Submitted: March 27, 2019
Decided: April 16, 2019

Before **STRINE**, Chief Justice; **VALIHURA**, **VAUGHN**, **SEITZ**, and **TRAYNOR**, Justices; constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **REVERSED** and **REMANDED**.

Michael J. Barry, Esquire, Christine M. Mackintosh, Esquire (*Argued*), Michael T. Manuel, Esquire, Rebecca A. Musarra, Esquire, GRANT & EISENHOFER P.A., Wilmington, Delaware, for Appellants, Verition Partners Master Fund Ltd. and Verition Multi-Strategy Master Fund Ltd.

Michael P. Kelly, Esquire (*Argued*), Steven P. Wood, Esquire, Daniel J. Brown, Esquire, MCCARTER & ENGLISH, LLP, Wilmington, Delaware; Marc J. Sonnenfeld, Esquire, Karen Pieslak Pohlmann, Esquire, Laura Hughes McNally, Esquire, MORGAN, LEWIS & BOCKIUS LLP, Philadelphia, Pennsylvania, for Appellee, Aruba Networks, Inc.

Ned Weinberger, Esquire, Derrick Farrell, Esquire, Thomas Curry, Esquire, LABATON SUCHAROW LLP, Wilmington, Delaware, for *Amici Curiae* Professors Audra Boone, Brian Broughman, Albert Choi, Jesse Fried, Mira Ganor, Antonio Macias, and Noah Stoffman in Support of Appellant and Reversal.

Gregory P. Williams, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware, for Professors William J. Carney and Keith Sharfman as *Amici Curiae* in Support of Appellee and Affirmance.

***PER CURIAM:***

In this statutory appraisal case, the Court of Chancery found that the fair value of Aruba Networks, Inc., as defined by 8 *Del. C.* § 262, was $17.13 per share, which was the thirty-day average market price at which its shares traded before the media reported news of the transaction that gave rise to the appellants' appraisal rights.[1] In its post-trial opinion, the Court of Chancery engaged in a wide-ranging discussion of its view on the evolution of our State's appraisal law and how certain recent decisions have affected the relevance of market-based evidence to determining fair value.[2] For purposes of this appeal, we need not respond in full to the dicta and instead focus on the key issue before us: whether the Court of Chancery abused its discretion, based on this record, in arriving at Aruba's thirty-day average unaffected market price as the fair value of the appellants' shares. Because the Court of Chancery's decision to use Aruba's stock price instead of the deal price minus synergies was rooted in an erroneous factual finding that lacked record support, we answer that in the positive and reverse the Court of Chancery's judgment. On remand, the Court of Chancery shall enter a final judgment for the petitioners awarding them $19.10 per share, which reflects the deal price minus the portion of synergies left with the seller as estimated by the respondent in this case, Aruba.

---

[1] *Verition Partners Master Fund Ltd. v. Aruba Networks, Inc.*, 2018 WL 922139, at *55 (Del. Ch. Feb. 15, 2018).

[2] *See, e.g.*, *id.* at *24–33.

## I.

In August 2014, Hewlett-Packard Company ("HP"), a publicly traded company, approached Aruba, another publicly traded company, about a potential combination. Aruba hired professionals and, in addition to negotiating with HP, began to shop the deal. Five other logical strategic bidders were approached, but none of them showed any interest.[3] The petitioners did not argue below that private equity bidders could compete given the synergies a combination with HP or another strategic buyer could garner.[4]

After several months of negotiations between the two companies, the Aruba board decided to accept HP's offer of $24.67 per share. News of the deal leaked to the press about two weeks later, causing Aruba's stock price to jump from $18.37 to $22.24. The next day, after the market closed, Aruba released its quarterly results, which beat analyst expectations. Aruba's stock price rose by 9.7% the following day on the strength of its earnings to close at $24.81 per share, just above the deal price.[5]

---

[3] *Id.* at *10. The board believed that "private equity firms would not be competitive in their potential valuations" given Aruba's "volatile revenues and unpredictable cash flows and the potential for synergies between Aruba's business with a strategic acquirer." *Id.* (internal quotation marks omitted).

[4] *See, e.g.*, App. to Answering Br. at B27 (Petitioners' Pretrial Br.).

[5] *Aruba*, 2018 WL 922139 at *20, 27.

Not long after the deal leaked, both companies' boards approved the transaction, and Aruba and HP formally announced the merger at a price of $24.67 per share. The final merger agreement allowed for another passive market check.[6] However, no superior bid emerged, and the deal closed on May 18, 2015.[7]

**II.**

On August 28, 2015, the appellants and petitioners below, Verition Partners Master Fund Ltd. and Verition Multi-Strategy Master Fund Ltd. (collectively, "Verition"), filed this appraisal proceeding in the Court of Chancery, asking the court to appraise the "fair value" of their shares under § 262.[8] The respondent was Aruba, albeit an Aruba now 100% controlled by HP. In its pretrial and initial post-trial briefing, Verition maintained that Aruba's fair value was $32.57 per share,[9] and Aruba contended that its fair value was either $19.45 per share (before trial) or $19.75 per share (after trial).[10] In its post-trial answering brief, Aruba contended that its "deal price less synergies" value was $19.10 per share.[11] Neither party

---

[6] *Id.* at *21.
[7] *Id.* at *22.
[8] *Id.*; 8 *Del. C.* § 262(a), (h).
[9] App. to Answering Br. at B53 (Petitioners' Pretrial Br.); App. to Opening Br. at A532 (Petitioners' Post-Trial Opening Br.); *id.* at A696 (Petitioners' Post-Trial Reply Br.).
[10] App. to Opening Br. at A148 (Respondent's Pretrial Br.); *id.* at A652 (Respondent's Post-Trial Answering Br.); *id.* at A707 (Respondent's Post-Trial Sur-Reply Br.).
[11] *Id.* at A630 (Respondent's Post-Trial Answering Br.).

3

claimed that Aruba's preannouncement stock price was the best measure of fair value at the time of the merger.

Post-trial argument was scheduled for May 17, 2017, but the Court of Chancery postponed the hearing "once it became clear that the Delaware Supreme Court's forthcoming decision in *DFC* [*Global Corp. v. Muirfield Value Partners, L.P.*[12]] likely would have a significant effect on the legal landscape."[13] After this Court issued its opinion in *DFC*, the Court of Chancery allowed the parties to submit supplemental briefing on the opinion's implications, and the parties submitted simultaneous briefs on September 15, 2017. Both parties continued to argue for their preferred fair value calculation, and neither party advocated for the adoption of the stock price, though Aruba did contend that the stock price was now "informative" of fair value and lent support to its argument that fair value as of the time of the merger was in the $19 to $20 per share range.[14] And the parties hewed to these positions during post-trial oral argument.

On December 14, 2017, this Court issued its opinion in *Dell, Inc. v. Magnetar Global Event Driven Master Fund Ltd*,[15] reversing the Court of Chancery's appraisal decision in that case. Six days later, the Vice Chancellor in this case—who was also

---

[12] 172 A.3d 346 (Del. 2017).
[13] *Aruba*, 2018 WL 922139, at *23.
[14] App. to Answering Br. at B59–60 (Respondent's Supplemental Post-Trial Br. on *DFC*).
[15] 177 A.3d 1 (Del. 2017).

the trial judge in *Dell*—sent the parties a letter on his own motion. In the letter, the Vice Chancellor requested supplemental briefing on "the market attributes of Aruba's stock" in part because he "learned how many errors [he] made in the *Dell* matter."[16]

The parties submitted simultaneous briefs in response to the Vice Chancellor's *sua sponte* request on January 26, 2018. In its brief, Aruba abandoned deal price minus synergies as its main benchmark and argued for the first time that its preannouncement stock price was "the single most important mark of its fair value."[17] Accordingly, Aruba asked the Court of Chancery to award the thirty-day unaffected market price of $17.13 per share.[18] Aruba's brief focused mainly on how the market for its stock was efficient.

On February 15, 2018, the Court of Chancery issued its post-trial opinion finding that the fair value under § 262 was $17.13 per share.[19] In its opinion, the Court of Chancery considered three different valuation measures: first, the "unaffected market price" of Aruba's stock before news of the merger leaked; second, the deal price minus the portion of synergies left with the seller; and third,

---

[16] App. to Answering Br. at B74–75 (Letter from the Court of Chancery to the Parties).
[17] App. to Opening Br. at A1014 (Respondent's Supplemental Post-Trial Br. on *Dell*).
[18] *Id.* at A1027.
[19] *Aruba*, 2018 WL 922139, at *1–2.

5

the two expert witnesses' valuations, which were based primarily on discounted cash flow ("DCF") models.[20]

In weighing the valuation methodologies, the Court of Chancery gave no weight to the parties' DCF models. The Court of Chancery also determined, based on its own analysis, that the appropriate deal price minus synergies value was $18.20. In reaching that conclusion, the Court of Chancery started with an estimate of the total amount of synergies HP expected to realize. To determine how much of those synergies Aruba's stockholders received in the deal price, the Court of Chancery took the midpoint of a study suggesting that "on average, sellers collect 31% of the capitalized value of synergies, with the seller's share varying widely from 6% to 51%."[21] This resulted in a deal price minus synergies value of $18.20 per share, $0.90 lower than Aruba's own estimate of deal price minus synergies. And although the Vice Chancellor was "inclined to think that Aruba's representatives bargained less effectively than they might have," "indicat[ing] that [Aruba] obtained fewer synergies than the midpoint range and imply[ing] value *north* of $18.20 per share,"[22] he failed to explain why his estimate of $18.20 per share was more reliable than Aruba's own estimate of $19.10 per share.

---

[20] *See id.* at *24–51.

[21] *Id.* at *45.

[22] *Id*. (emphasis added)

However, the Vice Chancellor did not adopt his deal price minus synergies value, in part because he believed that his "deal-price-less-synergies figure continues to incorporate an element of value resulting from the merger" in the form of "reduced agency costs that result from unitary (or controlling) ownership."[23] To remedy this, the Vice Chancellor elected to rely exclusively on the stock price because he thought he would need to estimate and back out these theoretical "reduced agency costs" from the deal price to arrive at a figure that reflected Aruba's value as a going concern. According to the Court of Chancery, using the "unaffected market price" of Aruba's publicly traded shares "provide[d] a direct estimate" of that endpoint, which led him to find the sole indicator of fair value to be that "unaffected market price" of $17.13 per share.[24] Although § 262 requires the Court of Chancery to assess Aruba's fair value as of "the effective date of the merger,"[25] the Court of Chancery arrived at the unaffected market price by averaging the trading price of Aruba's stock during the thirty days before news of the merger leaked, which was three to four months prior to closing.

---

[23] *Id.* at *54. The Vice Chancellor also cited the potential that he may have made errors in "backing out synergies" from the deal price as a reason for rejecting that figure. *Id.* at *53.

[24] *Id.* at *54. After the Court of Chancery issued its post-trial opinion, Verition moved for reargument, which the trial court denied. The court then entered a final judgment setting the fair value of Verition's shares at $17.13 per share, and this appeal followed.

[25] 8 *Del. C.* § 262(h).

# III.

We reverse the trial court's fair value determination.  Under *Cavalier Oil Corp. v. Hartnett*, the Court of Chancery's task in an appraisal case is "to value what has been taken from the shareholder: 'viz. his proportionate interest in a going concern.'"[26]  That is, the court must value the company "as an operating entity . . . but without regard to post-merger events or other possible business combinations."[27] *Cavalier Oil* draws this requirement from § 262's command that the court determine fair value "exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation,"[28] which this Court has interpreted as ruling out consideration of not just the gains that the particular merger will produce, but also the gains that might be obtained from any other merger.[29]  As a result, fair value "is more properly described as the value of the company to the stockholder as a going concern, rather than its value to a third party as an acquisition."[30]  Under this reading of § 262, the Court of Chancery must "exclude from any appraisal award the

---

[26] 564 A.2d 1137, 1144 (Del. 1989) (quoting *Tri–Continental Corp. v. Battye*, 74 A.2d 71, 72 (Del. 1950)).

[27] *Cavalier Oil*, 564 A.2d at 1144; *see also Dell, Inc. v. Magnetar Global Event Drive Master Fund Ltd.*, 177 A.3d 1, 20–21 (Del. 2017); *DFC Global Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 367–68 (Del. 2017).

[28] 8 *Del. C.* § 262(h).

[29] *In re Appraisal of Solera Holdings, Inc.*, 2018 WL 3625644, at *1 (Del. Ch. July 30, 2018); *Highfields Capital, Ltd. v. AXA Financial, Inc.*, 939 A.2d 34, 60–64 (Del. Ch. 2007); *Union Ill. 1995 Inv. Ltd. Partnership v. Union Fin. Grp., Ltd.*, 847 A.2d 340, 355–56 (Del. Ch. 2004).

[30] *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 795 (Del. 1999).

amount of any value that the selling company's shareholders would receive because a buyer intends to operate the subject company, not as a stand-alone going concern, but as a part of a larger enterprise, from which synergistic gains can be extracted."[31] For this reason, in cases where the Court of Chancery has used the price at which a company is sold in a third-party transaction, it has excised a reasonable estimate of whatever share of synergy or other value the buyer expects from changes it plans to make to the company's "going concern" business plan that has been included in the purchase price as an inducement to the sale.[32] No party in this proceeding argued to us that the long-standing use of going-concern value, or its concomitant requirement to excise synergy gains, should be revisited.

Applying the going-concern standard, we hold that the Court of Chancery abused its discretion in using Aruba's "unaffected market price" because it did so on the inapt theory that it needed to make an additional deduction from the deal price for unspecified "reduced agency costs." It appears to us that the Court of Chancery would have given weight to the deal price minus synergies absent its view that it also had to deduct unspecified agency costs to adhere to *Cavalier Oil*'s going-concern

---

[31] *Union Ill.*, 874 A.2d at 356; *see also Cavalier Oil*, 564 A.2d at 1144–45; *DFC*, 172 A.3d at 368; *Dell*, 177 A.3d at 21; *Golden GT LP v. Golden Telecom, Inc.*, 993 A.2d 497, 507 (Del. Ch. 2010), *aff'd*, 11 A.3d 214 (Del. 2010); *Highfields*, 939 A.2d at 42.
[32] *See, e.g.*, *Solera*, 2018 WL 3625644, at *1; *Union Ill.*, 847 A.2d at 343; *Highfields*, 939 A.2d at 59–61.

9

standard.[33]  As Verition points out, this aspect of the decision is not grounded in the record.  Judging by the law review articles cited by the Court of Chancery, the theory underlying the court's decision appears to be that the acquisition would reduce agency costs essentially because the resulting consolidation of ownership and control would align the interests of Aruba's managers and its public stockholders.[34]  In other words, the theory goes, replacing a dispersed group of owners with a concentrated group of owners can be expected to add value because the new owners are more capable of making sure management isn't shirking or diverting the company's profits, and that added value must be excluded under § 262 as "arising from the accomplishment or expectation of the merger or consolidation."[35]  However, unlike a private equity deal, the merger at issue in this case would not replace Aruba's public stockholders with a concentrated group of owners; rather, it would swap out one set of public stockholders for another: HP's.

Indeed, neither party presented any evidence to suggest that any part of the deal price paid by HP, a strategic buyer, involved the potential for agency cost reductions that were not already captured by its synergies estimate.  Synergies do

---

[33] The Court of Chancery identified the unspecified agency costs as one of "two significant sources of uncertainty," *Aruba*, 2018 WL 922139, at *53, the other being the imprecision of synergies estimates.

[34] *Cf.* Lawrence A. Hamermesh & Michael L. Wachter, *The Short and Puzzling Life of the "Implicit Minority Discount" in Delaware Appraisal Law*, 156 U. PA. L. REV. 1, 33–36 (2007).

[35] 8 *Del. C.* § 262(h).

not just involve the benefits when, for example, two symbiotic product lines can be sold together. They also classically involve cost reductions that arise because, for example, a strategic buyer believes it can produce the same or greater profits with fewer employees[36]—in English terms, rendering some of the existing employees "redundant." Private equity firms often expect to improve performance and squeeze costs too, including by reducing "agency costs."[37] Here, the Court of Chancery's belief that it had to deduct for agency costs ignores the reality that HP's synergies case likely already priced any agency cost reductions it may have expected. In short, the Court of Chancery acknowledged that there were estimates of the synergies expected by HP, and the record provides no reason to believe that those estimates omitted any other added value HP thought it could achieve because of the combination. For this reason, Aruba itself presented a deal price minus synergies value of $19.10 per share as one of its suggested outcomes.

As to this issue, Aruba never argued that its deal price minus synergies case did not fully account for all the "agency cost" reductions it expected, and the Court of Chancery's view that some measure of agency costs had to be accounted for finds no basis in the record. Nor does it find any basis in the corporate finance literature;

---

[36] *See* ROBERT W. HOLTHAUSEN & MARK E. ZMIJEWSKI, CORPORATE VALUATION: THEORY, EVIDENCE & PRACTICE 681 (2014).

[37] *See, e.g.*, *Solera*, 2018 WL 3625644, at \*28; HOLTHAUSEN & ZMIJEWSKI, *supra*, at 612–13.

given that all the cost reductions HP expected as a widely held, strategic buyer were likely to be fully accounted for by its expected synergies.[38]  Theory here tracks the facts, and there was no reasonable basis to infer that Aruba was cheating itself out of extra agency cost reductions by using only the cost reductions that were anticipated in commercial reality.  However, instead of at least awarding Verition the deal price minus HP's estimate of its expected synergies left with the seller, which generated a value that was corroborated by the standalone DCF models used by Aruba's and HP's boards in agreeing to the transaction,[39] the Court of Chancery gave exclusive weight to the thirty-day average unaffected market price of $17.13 per share.

In addition to believing that it had to account for unspecified agency costs, the Court of Chancery also seemed to suggest that rote reliance on market prices was compelled based on its reading of *DFC* and *Dell*.[40]  Like any human perspective, the trial judge's broader reading of *Dell* and *DFC* is arguable, but the trial judge's sense

---

[38] *Compare* HOLTHAUSEN & ZMIJEWSKI, *supra*, at 612–13 (explaining agency cost reductions as a possible motivation for leveraged buyouts), *with id.* at 677–78, 681–82 (explaining value creation in strategic M&A deals primarily in terms of synergies).  *See also* Michael C. Jensen & William H. Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure*, 3 J. FIN. ECON. 305, 308–10, 312–19 (1976).

[39] *See* App. to Answering Br. at B237 (Project Aspen Preliminary Valuation Materials (Jan. 26, 2015)) (presenting a DCF valuation range for Aruba of $17.47 to $22.61, with a midpoint of $20.04); App. to Opening Br. at A1962 (Presentation to HP's IRB (Feb. 28, 2015)) (presenting a standalone DCF valuation for Aruba of $19.10); *Aruba*, 2018 WL 922139, at *17 (noting Aruba's bankers estimated a DCF valuation ranging from $17.58 to $27.76, with the weighted average cost of capital and perpetuity growth rate midpoints indicating $21.60).

[40] *See Aruba*, 2018 WL 922139, at *51–55.

that those decisions somehow compelled him to make the decision he did was not supported by any reasonable reading of those decisions or grounded in any direct citation to them. Among other things, the trial judge seemed to find it novel that *DFC* and *Dell* recognized that when a public company with a deep trading market is sold at a substantial premium to the preannouncement price, after a process in which interested buyers all had a fair and viable opportunity to bid, the deal price is a strong indicator of fair value, as a matter of economic reality and theory. The apparent novelty the trial judge perceived is surprising, given the long history of giving important weight to market-tested deal prices in the Court of Chancery and this Court, a history that long predated the trial judge's contrary determination in *Dell*.[41]

---

[41] *See, e.g.*, *M.P.M. Enters., Inc. v. Gilbert*, 731 A.2d 790, 797 (Del. 1999) ("A merger price resulting from arm's-length negotiations where there are no claims of collusion is a very strong indication of fair value."); *Huff Fund Inv. P'ship v. CKx, Inc.*, 2013 WL 5878807, at *9, 13 (Del. Ch. Nov. 1, 2013), *aff'd*, 2015 WL 631586 (Del. Feb. 12, 2015) (noting the Court of Chancery has previously relied "on the merger price itself as evidence of fair value, so long as the process leading to the transaction is a reliable indicator of value and merger-specific value is excluded," and concluding that "the merger price is the most reliable indicator of value" in that case) (internal quotation marks omitted)); *Merion Capital LP v. BMC Software, Inc.*, 2015 WL 6164771, at *1 (Del. Ch. Oct. 21, 2015) ("I find it appropriate to look to the price generated by the market through a thorough and vigorous sales process as the best indication of fair value under the specific facts presented here."); *Merlin Partners LP v. AutoInfo, Inc.*, 2015 WL 2069417, at *17–18 (Del. Ch. Apr. 30, 2015) ("Where, as here, the market prices a company as the result of a competitive and fair auction, the use of alternative valuation techniques like a DCF analysis is necessarily a second-best method to derive value." (internal quotation marks omitted)); *In re Appraisal of Ancestry.com, Inc.*, 2015 WL 399726, at *23 (Del. Ch. Jan. 30, 2015) ("I find that the merger price of $32 is the best indicator of Ancestry's fair value as of the Merger Date."); *Highfields Capital, Ltd. v. AXA Fin.*, 939 A.2d 34, 59 (Del. Ch. 2007) ("[A] court may derive fair value in a Delaware appraisal action if the sale of the company in question resulted from an arm's-length bargaining process where no structural impediments existed that might prevent a topping bid."), *Montgomery Cellular Holding Co. v. Dobler*, 880 A.2d 206, 220 (Del. 2005) ("In performing its valuation, the Court of Chancery is free to consider the price actually derived from the sale of the company being valued

For example, the Court of Chancery equated the view that the deal price can serve as reliable evidence of fair value when a buyer pays the highest price, after other logical buyers have been given access to confidential information and a fair chance to present a superior offer, with being one that "discount[s] the importance of competition."[42] Of course, when there is an open opportunity for many buyers to buy and only a few bid (or even just one bids), that does not necessarily mean that there is a failure of competition; it may just mean that the target's value is not sufficiently enticing to buyers to engender a bidding war above the winning price.[43]

---

. . . ."), *Union Ill. 1995 Inv. Partnership v. Union Fin. Grp., Ltd.*, 847 A.2d 340, 364 (Del. Ch. 2004) ("I will award the value of the Merger Price net of synergies."); *Cooper v. Pabst Brewing Co.*, 1993 WL 208763, at *9 (Del. Ch. June 8, 1993) ("[U]nder conventional principles of economics, the results of the auction for Pabst might be expected to provide a reasonable indication of Pabst's value that this Court can consider in light of the parties' failure to satisfactorily provide a persuasive measure of value using other techniques."); *Van de Walle v. Unimation, Inc.*, 1991 WL 29303, at *17 (Del. Ch. Mar.7, 1991) ("The most persuasive evidence of the fairness of the . . . merger price is that it was the result of arm's-length negotiations between two independent parties, where the seller . . . was motivated to seek the highest available price, and a diligent and extensive canvass of the market had confirmed that no better price was available."); Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 DUKE L. J. 613, 655 (1998) ("The best evidence of value, if available, is third-party sales value. If such evidence is not available, there is no choice but to resort to less precise valuation techniques."). And our historic reliance on the deal price as a market indicator of fair value in appraisal cases conforms to our use of market-tested prices in other analogous areas. *See, e.g.*, *Applebaum v. Avaya, Inc.*, 812 A.2d 880, 889–90 (Del. 2002) ("[O]ur jurisprudence recognizes that in many circumstances a property interest is best valued by the amount a buyer will pay for it."); *Poole v. N. V. Deli Maatschappij*, 243 A.2d 67, 70 n.1 (Del. 1968) (defining "[f]air market value . . . as the price which would be agreed upon by a willing seller and a willing buyer under usual and ordinary circumstances, after consideration of all available uses and purposes, without any compulsion upon the seller to sell or upon the buyer to buy"); *State ex rel. Smith v. 0.15 Acres of Land, More or Less, in New Castle Hundred, New Castle Cty.*, 169 A.2d 256, 258 (Del. 1961) (same); *Wilmington Housing Auth. v. Harris*, 93 A.2d 518, 521 (Del. 1952) (same).
[42] *Aruba*, 2018 WL 922139, at *40.
[43] *See Dell*, 177 A.3d at 32 (discussing the winner's curse).

14

In this case, for instance, Aruba approached other logical strategic buyers prior to signing the deal with HP, and none of those potential buyers were interested. Then, after signing and the announcement of the deal, still no other buyer emerged even though the merger agreement allowed for superior bids. It cannot be that an open chance for buyers to bid signals a market failure simply because buyers do not believe the asset on sale is sufficiently valuable for them to engage in a bidding contest against each other. If that were the jurisprudential conclusion, then the judiciary would itself infuse assets with extra value by virtue of the fact that no actual market participants saw enough value to pay a higher price. That sort of alchemy has no rational basis in economics.

In fact, encouraged by *Weinberger v. UOP, Inc.*,[44] our courts have for years applied corporate finance principles such as the capital asset pricing model to value companies in appraisal proceedings in ways that depend on market efficiency. The reliable application of valuation methods used in appraisal proceedings, such as DCF and comparable companies analysis, often depends on market data and the efficiency of the markets from which that data is derived. For example, it is difficult to come up with a reliable beta if the subject company's shares do not trade in an efficient

---

[44] 457 A.2d 701 (Del. 1983).

market,[45] and the reliability of a comparable companies or transactions analysis depends on the underlying efficiency of the markets from which the multiples used in the analysis are derived.[46]

Even before this Court's seminal opinion in *Weinberger*, the old Delaware "block" method used market prices in one of its three prongs.[47] In forsaking the Delaware block method as a rigid basis to determine fair value, *Weinberger* did not hold that market value was no longer relevant; in fact, *Weinberger* explicitly condoned its use.[48] Extending this basic point, *DFC* and *Dell* merely recognized that a buyer in possession of material nonpublic information about the seller is in a strong position (and is uniquely incentivized) to properly value the seller when agreeing to buy the company at a particular deal price, and that view of value should be given considerable weight by the Court of Chancery absent deficiencies in the deal process.[49]

---

[45] *See, e.g.*, *In re Appraisal of Dell Inc.*, 2016 WL 3186538, at *49 (Del. Ch. May 31, 2016), *aff'd in part, rev'd in part on other grounds sub nom. Dell, Inc. v. Magnetar Global Event Drive Master Fund Ltd.*, 177 A.3d 1, 35 (Del. 2017); HOLTHAUSEN & ZMIJEWSKI, *supra*, at 293–308.

[46] *See, e.g.*, *Taylor v. Am. Specialty Retailing Grp., Inc.*, 2003 WL 21753752, at *7 (Del. Ch. July 25, 2003); *Gentile v. SinglePoint Fin., Inc.*, 2003 WL 1240504, at *6–7 (Del. Ch. Mar. 5, 2003); HOLTHAUSEN & ZMIJEWSKI, *supra*, at 552; BRADFORD CORNELL, CORPORATE VALUATION 87 (1993).

[47] *See, e.g.*, *In re General Realty & Utils. Corp.*, 52 A.2d 6, 15–16 (Del. Ch. 1947).

[48] *Weinberger*, 457 A.2d at 713 (observing that "market value" is "not only pertinent to an inquiry as to the value of the dissenting stockholders' interest, but must be considered by the agency fixing the value").

[49] *See Dell*, 177 A.3d at 35; *DFC Global Corp. v. Muirfield Value Partners, L.P.*, 172 A.3d 346, 367 (Del. 2017).

Likewise, assuming an efficient market, the unaffected market price and that price as adjusted upward by a competitive bidding process leading to a sale of the entire company was likely to be strong evidence of fair value. By asserting that *Dell* and *DFC* "indicate[] that Aruba's unaffected market price is entitled to substantial weight,"[50] the Vice Chancellor seemed to suggest that this Court signaled in both cases that trading prices should be treated as exclusive indicators of fair value. However, *Dell* and *DFC* did not imply that the market price of a stock was necessarily the best estimate of the stock's so-called fundamental value at any particular time.[51] Rather, they did recognize that when a market was informationally efficient in the sense that "the market's digestion and assessment of all publicly available information concerning [the Company] [is] quickly impounded into the Company's stock price," the market price is likely to be more informative of fundamental value.[52] In fact, *Dell*'s references to market efficiency focused on informational efficiency—the idea that markets quickly reflect publicly available

---

[50] *Aruba*, 2018 WL 922139, at *51.

[51] *See, e.g.*, *Dell*, 177 A.3d at 35 ("[W]e are not saying that the market is always the best indicator of value, or that it should always be granted some weight.").

[52] *Id.* at 7; *DFC*, 172 A.3d at 349 ("Like any factor relevant to a company's future performance, the market's collective judgment of the effect of regulatory risk may turn out to be wrong, but established corporate finance theories suggest that the collective judgment of the many is more likely to be accurate than any individual's guess. When the collective judgment involved, as it did here, not just the views of company stockholders, but also those of potential buyers of the entire company and those of the company's debtholders with a self-interest in evaluating the regulatory risks facing the company, there is more, not less, reason to give weight to the market's view of an important factor.").

17

information and can be a proxy for fair value—not the idea that an informationally efficient market price invariably reflects the company's fair value in an appraisal or fundamental value in economic terms.[53]  Nonetheless, to the extent the Court of Chancery read *DFC* and *Dell* as reaffirming the traditional Delaware view,[54] which is accepted in corporate finance, that the price a stock trades at in an efficient market is an important indicator of its economic value that should be given weight, it was correct.[55]  And to the extent that the Court of Chancery also read *DFC* and *Dell* as reaffirming the view that when that market price is further informed by the efforts

---

[53] Indeed, the key distinction between the semi-strong version of the efficient capital markets hypothesis (ECMH), which both *Dell* and *DFC* embrace, *Dell*, 177 A.3d at 25; *DFC*, 172 A.2d at 373–74, and the strong version of the ECMH is that the semi-strong version assumes that markets reflect only all *publicly available* information whereas the strong version assumes that markets reflect *all* information, and are therefore, by extension, more likely to reflect fundamental value. RICHARD A. BREALEY, STEWART C. MYERS & FRANKLIN ALLEN, PRINCIPLES OF CORPORATE FINANCE 358–59 (9th ed. 2008).

[54] *See Dell*, 177 A.3d at 24 ("Further, the Court of Chancery's analysis ignored the efficient market hypothesis long endorsed by this Court.  It teaches that the price produced by an efficient market is generally a more reliable assessment of fair value than the view of a single analyst, especially an expert witness who caters her valuation to the litigation imperatives of a well-heeled client."); *DFC Global Corp.*, 172 A.3d at 370 ("Indeed, the relationship between market valuation and fundamental valuation has been strong historically.  As one textbook puts it, '[i]n an efficient market you can trust prices, for they impound all available information about the value of each security.'  More pithily: 'For many purposes no formal theory of value is needed. We can take the market's word for it.'") (footnotes omitted); *see also supra* note 41.

[55] *See, e.g.*, Ronald J. Gilson & Reinier Kraakman, *Market Efficiency after the Financial Crisis: It's Still a Matter of Information Costs*, 100 VA. L. REV. 313, 317 (2014) ("Even if we cannot observe fundamental efficiency, we can with confidence predict that making prices more informationally efficient will move them in the direction of fundamental efficiency."); CORNELL, *supra*, at 47 ("The efficient market hypothesis has two important implications for appraisal practice.  First, and most importantly, it implies that in situations where the stock and debt approach can be employed, it will produce the most reliable indicator of value . . . . [T]he EMH states that the market assessment of value is more accurate, on average, than that of any individual, including an appraiser.").

18

of arm's length buyers of the entire company to learn more through due diligence, involving confidential non-public information, and with the keener incentives of someone considering taking the non-diversifiable risk of buying the entire entity, the price that results from that process is even more likely to be indicative of so-called fundamental value, it was correct.[56]

Here, the price that HP paid could be seen as reflecting a better assessment of Aruba's going-concern value for reasons consistent with corporate finance theory. For starters, the unaffected market price was a measurement from three to four months prior to the valuation date, a time period during which it is possible for new, material information relevant to a company's future earnings to emerge. Even more important, HP had more incentive to study Aruba closely than ordinary traders in small blocks of Aruba shares, and also had material, nonpublic information that, by definition, could not have been baked into the public trading price. For example, HP

---

[56] *Dell*, 177 A.3d at 35 ("In so holding, we are not saying that the market is always the best indicator of value, or that it should always be granted some weight. We only note that, when the evidence of market efficiency, fair play, low barriers to entry, outreach to all logical buyers, and the chance for any topping bidder to have the support of [the CEO's] own votes is so compelling, then failure to give the resulting price heavy weight because the trial judge believes there was mispricing missed by all the Dell stockholders, analysts, and potential buyers abuses even the wide discretion afforded the Court of Chancery in these difficult cases."); *DFC*, 172 A.3d at 370 ("For these reasons, corporate finance theory reflects a belief that if an asset—such as the value of a company as reflected in the trading value of its stock—can be subject to close examination and bidding by many humans with an incentive to estimate its future cash flows value, the resulting collective judgment as to value is likely to be highly informative and that, all estimators having equal access to information, the likelihood of outguessing the market over time and building a portfolio of stocks beating it is slight.").

knew about Aruba's strong quarterly earnings before the market did, and likely took that information into account when pricing the deal. Based on the record evidence, the Court of Chancery could easily have found that HP and Aruba's back and forth over price, HP's access to nonpublic information to supplement its consideration of the public information available to stock market buyers, and the currency of the information that they had at the time of striking a bargain had improved the parties' ability to estimate Aruba's going-concern value over that of the market as a whole.[57] In particular, HP had better insight into Aruba's future prospects than the market because it was aware that Aruba expected its quarterly results to exceed analysts' expectations.[58] When those strong quarterly results were finally reported—after the close of the period that the Court of Chancery used to measure the "unaffected market price"—Aruba's stock price jumped 9.7%. Indeed, after the market learned

---

[57] *See Aruba*, 2018 WL 922139, at *21; Br. of Amici Curiae Professors in Support of Appellant and Reversal at 4–6.

[58] *Aruba*, 2018 WL 922139, at *11–13. The trial judge's focus on the unaffected trading price seems inspired by his view of *Dell* and in particular his view that its reference to that sort of pricing as relevant to fair value was novel. *See id.* at *24–34. That is strange because the unaffected trading price has often formed a foundational element of many forms of valuation used in our courts, and was even a part of the Delaware block method. *See, e.g.*, *General Realty*, 52 A.2d at 15–16. The trial judge's decision to use the trading price as his sole basis for determining fair value was his alone, and in no way dictated by a rational reading of *Dell*. Before the trial judge fixated on this measure as his own focus, Aruba at most argued that it was informative of fair value and one component for coming to a final estimate. Notably, nothing in *Dell* suggested that the unaffected trading price should be used solely, especially when a bidder like HP had material nonpublic information, and when the company itself had important earnings information it had not released. The decision to give exclusive weight to the unaffected trading price on a record that did not allow the ordinary adversarial process for testing the relevant factors was that of the trial court alone.

20

about the strong quarter and the likelihood of a strategic deal with HP, Aruba's stock traded at $24.81, $0.14 away from the actual price HP paid. Of course, despite expressing concern about the fact that no other bidder emerged to compete with HP at the $24-plus price range, the Court of Chancery then awarded Verition $7.54 per share less than the $24.67 deal price.

By relying exclusively on the thirty-day average market price, the Court of Chancery not only abused its discretion by double counting agency costs but also injected due process and fairness problems into the proceedings. As Verition argued, the Vice Chancellor's desire not to award deal price minus synergies could be seen— in light of his letter to the parties and the overall tone of his opinion and reargument decision—as a results-oriented move to generate an odd result compelled by his personal frustration at being reversed in *Dell*. Indeed, the idea of awarding the stock price came into the proceedings from the Vice Chancellor himself after requesting supplemental post-trial briefing on the matter.[59] Prior to that point, neither party argued for that figure as the fair value under § 262. Because the Vice Chancellor

---

[59] Based on our reading of the record, neither party requested supplemental briefing after our opinion in *Dell* issued. And neither party asked the Court of Chancery to set fair value at the unaffected market price until long after trial, when the Vice Chancellor sent a letter to the parties requesting supplemental submissions to address the implications of this Court's decision in *Dell*. App. to Answering Br. at B74–75 (Letter from the Court of Chancery to the Parties). After that letter explicitly requested information about the market attributes of Aruba's stock, Aruba pivoted from its previous reliance on its expert's discounted cash-flow model and the deal price minus synergies to ask for the first time that the court set fair value at the unaffected thirty-day average market price of $17.13 per share. *See* App. to Opening Br. at A1014 (Respondent's Supplemental Post-Trial Br. on *Dell*).

introduced this issue late in the proceedings, the extent to which the market price approximated fair value was never subjected to the crucible of pretrial discovery, expert depositions, cross-expert rebuttal, expert testimony at trial, and cross examination at trial. Instead, the Vice Chancellor surfaced Aruba's stock price as an appropriate measure of fair value in a way that is antithetical to the traditional hallmarks of a Court of Chancery appraisal proceeding. The lack of a developed record on whether the stock price was an adequate proxy for fair value buttresses our holding that the Court of Chancery abused its discretion by awarding the thirty-day average unaffected market price of $17.13 per share.

These procedural issues relate to substance in an important way. The reason for pretrial discovery and trial is for parties to have a chance to test each other's evidence and to give the fact-finder a reliable basis to make an ultimate determination after each side has a fair chance to develop a record and to comment upon it. The lack of that process here as to the Vice Chancellor's ultimate remedy is troubling. The Vice Chancellor slighted several important factors in choosing to give exclusive weight to the unaffected market price. Under the semi-strong form of the efficient capital markets hypothesis, the unaffected market price is not assumed to factor in nonpublic information. In this case, however, HP had signed a confidentiality agreement, done exclusive due diligence, gotten access to material nonpublic information, and had a much sharper incentive to engage in price

22

discovery than an ordinary trader because it was seeking to acquire all shares. Moreover, its information base was more current as of the time of the deal than the trading price used by the Vice Chancellor. Compounding these issues was the reality that Aruba was set to release strong earnings that HP knew about in the final negotiations, but that the market did not. As previously noted, Aruba's stock price jumped 9.7% once those earnings were finally reported to the public. None of these issues were illuminated in the traditional way, and none of them were discussed by the Court of Chancery in a reasoned way in giving exclusive weight to a prior trading price that was $7.54 below what HP agreed to pay, and well below what Aruba had previously argued was fair value.

This multitude of concerns gives us pause, as does the evident plausibility of Verition's concern that the trial judge was bent on using the thirty-day average market price as a personal reaction to being reversed in a different case. In a reargument decision addressing the petitioner's argument to this effect, the Vice Chancellor denied that this was the case.[60] We take him at his word. However, so too do we take him at his word that he viewed an estimate of deal price minus synergies as compelling evidence of fair value on this record but that he could not

---

[60] *Verition Partners Master Fund Ltd. v. Aruba Networks, Inc.* (*Decision on Petitioner's Motion for Reargument*), 2018 WL 2315943, at *17 (Del. Ch. May 21, 2018) ("I personally do not believe that I issued the Post–Trial Ruling out of frustration. To the contrary, I personally believe that I engaged in a lengthy, laborious (in both senses), and reasoned effort to implement Delaware Supreme Court precedent.").

come up with a reliable estimate of his own because he wanted to double count agency costs, and also lacked confidence in his underlying synergy deduction.[61] Nevertheless, fixing the double counting problem and hewing to the record developed by the parties themselves leaves a reliable estimate of deal price minus synergies,[62] which is the one that Aruba advanced until the Vice Chancellor himself injected the thirty-day average market price as his own speculative idea. Of course, estimating synergies and allocating a reasonable portion to the seller certainly involves imprecision, but no more than other valuation methods, like a DCF analysis that involves estimating (i) future free cash flows; (ii) the weighted average cost of capital (including the stock's beta); and (iii) the perpetuity growth rate. But here there is no basis to think Aruba was being generous in its evaluation of deal price

---

[61] *Aruba*, 2018 WL 922139, at *51–54.

[62] The Vice Chancellor's view that he had to further deduct additional agency costs is not only flawed for the reason we mentioned, it was in tension with his own reasoning. The Vice Chancellor believed that the negotiators for Aruba were not as skilled or as vigorous as he would have been in risking getting no deal from a bidder that was bidding well above the company's unaffected market price and that was bidding well above a level of any interest to any other logical buyer, and that Aruba therefore did not get as big a share of the synergies as he viewed possible. *See Aruba*, 2018 WL 922139, at *45 (opining that Aruba "obtained a relatively low share of the synergies from HP" and therefore that the deal price minus synergies was "north of $18.20 per share," yet nevertheless concluding that the deal price minus synergies was $18.20 per share). *See generally* Lawrence A. Hamermesh & Michael L. Wachter, *Finding the Right Balance in Appraisal Litigation: Deal Price, Deal Process, and Synergies*, 73 BUS. LAW. 961, 1005–06 (2018) ("[A] perception that bargaining was relatively weak may imply that the target's stockholders received a relatively smaller share of overall synergies, and vice versa."). If this was so, we perceive no rational basis in the record for his finding that Aruba's own $19.10 per share estimate was too high.

minus synergies. And, as any measure of value should be, Aruba's $19.10 deal price minus synergies value is corroborated by abundant record evidence.[63]

The Vice Chancellor himself concluded that because the HP–Aruba transaction involved enormous synergies, "the deal price . . . operates as a ceiling for fair value."[64] That conclusion was abundantly supported by the record. Aruba's estimate of $19.10 resulting from that method was corroborated by HP's and

---

[63] *See supra* note 39. Straining to justify a victory on a ground and at a value level it never sought at trial, Aruba disavowed in oral argument the deal price minus synergies method. We chalk up this about-face to a litigant receiving a more favorable outcome than they argued for and trying to cement that unexpected victory on appeal. In the actual record of the case developed and completed in full before the Vice Chancellor pressed an issue not raised by any party, Aruba's expert report contained an entire section on the deal price minus synergies method, its briefs contained full sections arguing for the Court of Chancery to adopt it, and Verition was given a full opportunity—which it took—to respond at length to these arguments. *See* App. to Opening Br. at A121–29 (Respondent's Pretrial Br.) (arguing that "the deal price minus synergies is a reliable indication of fair value"); *id.* at A148 ("Aruba requests that the court . . . determin[e] that the fair value of Aruba . . . is $19.45 per share—a number that is consistent with both Dages' DCF valuation and the deal price minus synergies . . . ."); *id.* at A1843–49 (Expert Report of Kevin Dages) (offering the "Merger Price (Excluding Any Synergies)" as evidence of fair value and identifying "fair value indications . . . of $19.93 per share based on the Barclay's [sic] analysis and $18.98 per share based on HP's internal analysis"); Expert Rebuttal Report of Paul A. Marcus at 21–30 (Sept. 2, 2016) (criticizing Dages's use of the merger price as an indicator of fair value); *id.* at A325–26 (Direct Examination of Paul A. Marcus) (Verition's expert testifying that he considered the deal price in determining fair value and explaining why he chose not to rely on it); *id.* at A347 (Cross-Examination of Paul A. Marcus) (Aruba's counsel cross-examining Verition's expert about his decision not to rely on the deal price); *id.* at A378–79 (Direct Examination of Daniel Warmenhoven) (Aruba's lead independent director testifying about the existence of revenue and cost synergies and stating those synergies were "[v]ery substantial"); *id.* at A418 (Direct Examination of Dominic Orr) (Aruba's CEO testifying as to synergies); *id.* at A480 (Aruba's industry expert testifying as to synergies); *id.* at A616–19 (Respondent's Post-Trial Answering Br.) (contending that "significant, measurable synergies were anticipated in the deal"); *id.* at A622–30 (arguing that "the merger price less synergies approach is a reliable indicator of fair value"); *id.* at A668–80 (Petitioners' Post-Trial Reply Br.) (arguing that "fair value cannot be determined via reference to 'deal price minus synergies'"); *id.* at A708–23 (Respondent's Post-Trial Sur-Reply Br.) (responding to Verition's arguments against relying on the deal price).
[64] *Aruba*, 2018 WL 922139, at *52.

Aruba's real-time considerations[65] and Aruba's DCF,[66] comparable companies,[67] and comparable transactions analyses.[68]

Rather than burden the parties with further proceedings, we order that a final judgment be entered for the petitioners in the amount of $19.10 per share plus any interest to which the petitioners are entitled.

---

[65] *See supra* note 39.

[66] *Id.* at A1880 (Expert Report of Kevin Dages (July 29, 2016)) (presenting a DCF value for Aruba of $19.85).

[67] *Id.* (presenting mid-point value based on Aruba's 2016 EBITDA of $21.75).

[68] *Id.* (presenting a mid-point value for the comparable transaction analysis at $17.94).