IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRIGADE LEVERAGED CAPITAL STRUCTURES FUND LTD. and BRIGADE DISTRESSED VALUE MASTER FUND LTD., | § § § § § | |
| | § | No. 427, 2019 |
| Petitioners Below, Appellants, | § § | |
| | § | Court Below – Court of Chancery |
| v. | § | of the State of Delaware |
| | § | |
| STILLWATER MINING COMPANY, | § § | |
| | § | C.A. No. 2017-0385-JTL |
| Respondent Below, Appellee. | § § | |

Submitted: July 15, 2020
Decided: October 12, 2020

Before **SEITZ**, Chief Justice; **VAUGHN**, and **MONTGOMERY-REEVES**, Justices.

Upon appeal from the Court of Chancery. **AFFIRMED.**

Samuel T. Hirzel, Esquire, Elizabeth A. DeFelice, Esquire, HEYMAN ENERIO GATTUSO & HIRZEL LLP, Wilmington, Delaware; Lawrence M. Rolnick, Esquire, Steven M. Hecht, Esquire, ROLNICK KRAMER SADIGHI LLP, New York, New York, *for Petitioners-Appellants*.

S. Mark Hurd, Esquire, Lauren Neal Bennett, Esquire, MORRIS, NICHOLS, ARSHT & TUNELL LLP, Wilmington, Delaware; James R. Warnot, Jr., Esquire, Adam S. Lurie, Esquire, Brenda D. DiLuigi, Esquire, Nicole E. Jerry, Esquire, Elizabeth M. Raulston, Esquire, LINKLATERS LLP, New York, New York, *for Respondent-Appellee*.

**MONTGOMERY-REEVES**, Justice:

On May 4, 2017, Sibanye Gold Ltd. ("Sibanye") acquired Stillwater Mining Co. ("Stillwater") through a reverse triangular merger. Under the terms of the merger agreement, each Stillwater share at closing was converted into the right to receive $18 of merger consideration. Between the signing and the closing of the merger, the commodity price for palladium, which Stillwater mined, increased by nine percent, improving Stillwater's value.

Certain former Stillwater stockholders dissented to the merger, perfected their statutory appraisal rights, and pursued this litigation. During the appraisal trial, petitioners argued that the flawed deal process made the deal price an unreliable indicator of fair value and that increased commodity prices raised Stillwater's fair value substantially between the signing and closing of the merger. On August 21, 2019, the Court of Chancery issued its memorandum opinion (the "Memorandum Opinion"), holding that the $18 per share deal price was the most persuasive indicator of Stillwater's fair value at the time of the merger. The court did not award an upward adjustment for the increased commodity prices.

The petitioners now appeal the Court of Chancery's decision, arguing that the court abused its discretion when it ignored the flawed sale process and petitioners' argument for an upward adjustment to the merger consideration.

2

Having reviewed the parties' briefs and the record on appeal, and after oral argument, this Court holds that the Court of Chancery did not abuse its discretion when it deferred to the deal price as a reliable indicator of fair value without an upward adjustment. Therefore, this Court affirms the Court of Chancery's August 21, 2019 Memorandum Opinion and September 27, 2019 Post-Trial Judgment order.

## I.    BACKGROUND[1]

Stillwater Mining Company was a publicly traded Delaware corporation primarily engaged in the business of mining and processing platinum group metals ("PGMs") from the J-M Reef in Montana. The J-M Reef is the only PGM mine in the United States, with the only other significant deposits located in South Africa and Russia. Stillwater has two producing mines at the J-M Reef, Stillwater Mine and East Boulder.[2] Stillwater also owns one of the largest PGM recycling operations in the world, which provides additional market supply of PGMs.[3] In light of its operations, Stillwater's common stock trading price is heavily influenced by the spot and forward pricing of the PGM palladium.[4]

By October 2015, Stillwater's board of directors (the "Board") and management had become concerned that both the palladium and platinum markets

---

[1] This Court takes the essential facts from the Memorandum Opinion. *In re Stillwater Mining Co.*, 2019 WL 3943851 (Del. Ch. Aug. 21, 2019).
[2] *Id.* at *2.
[3] Appendix to the Opening Br. 425, 1283 (hereafter "A_").
[4] *Stillwater Mining*, 2019 WL 3943851, at *2.

were facing long-term "structural decline[s],"[5] largely due to the decline in gasoline and diesel-powered automotive markets, the primary end-use of Stillwater's PGMs.[6] Accordingly, the Board began to consider strategic alternatives, including a merger of equals or the sale of some of Stillwater's business operations.[7]

In 2016, the Board's fears materialized as Stillwater's stock price declined, reflecting a decrease in the spot price of palladium that continued throughout the year. Due to the downturn in the trading price, the Board authorized Michael McMullen, Stillwater's CEO and board member, to inquire into strategic opportunities and report back to the Board.[8] Also around this time, McMullen privately expressed unease at the company's situation and began considering his exit from Stillwater.[9]

### A. McMullen Engages with Sibanye

On January 30, 2016, Sibanye requested a meeting to discuss the acquisition of Stillwater.[10] Without the Board's knowledge or approval, McMullen met with Neal Froneman, Sibanye's CEO, on March 1, 2016.[11] At the meeting, McMullen asked Froneman to provide "an informal proposal" that included "an idea of

---

[5] A2439.
[6] A2438-41; A1854-55.
[7] Appendix to the Answering Br. 30-31, 311 (hereafter "B_").
[8] *Stillwater Mining*, 2019 WL 3943851, at *4.
[9] *Id.* at *5.
[10] *Id.*
[11] *Id.*

4

valuation" and "transaction structure."[12]   He told Froneman that any potential acquisition would need to feature "a large cash component."[13]  McMullen also stated that Stillwater would need to "be priced at a premium of 30% over Stillwater's thirty-day volume-weighted average price ('VWAP')."[14]  After the meeting, Froneman had the impression that a deal "was doable if we got the valuation right."[15]  McMullen took these actions without involving the Board, and he did not inform the Board about his discussions with Sibanye at the Board's next regularly scheduled meeting in May 2016.[16]

By July 2016, Stillwater's stock price and the price of palladium had largely recovered.  On July 21, 2016, Sibanye provided a preliminary, non-binding indication of interest at $15.75 per share in cash.[17]  Shortly thereafter, on July 27 and 28, 2016, Stillwater's Board met in "executive session" with McMullen to discuss Sibanye's offer.[18]   On August 9, 2016, Stillwater executed a confidentiality agreement with Sibanye and provided Sibanye data room access.[19]

---

[12] *Id.*
[13] *Id.*
[14] *Id.* at *5.
[15] *Id.*
[16] *Id.* at *5-6.
[17] *Id.* at *6.
[18] *Id.* at *7; B1088-94.
[19] *Stillwater Mining*, 2019 WL 3943851, at *7; A1856; A2458-59.

**B. Stillwater Engages with Other Parties**

On August 10, 2016, the Board met and directed management to begin outreach to other potentially interested parties.[20] But instead of working to generate "as much interest as possible" in a transaction with Stillwater, McMullen continued to focus on courting Sibanye.[21] Nonetheless, Stillwater's management met with Bank of America Merrill Lynch ("BAML") on August 18, 2016, to discuss potential options.[22] At that meeting, BAML got "the sense . . . that a sale was a possibility" and independently contacted a list of fifteen potential acquirers about purchasing Stillwater.[23] Meetings were arranged with a number of interested parties, including Hecla, Coeur, Kinross, and Gold Fields.[24] By early October, both Hecla and Coeur conducted site visits and obtained access to the data room.[25]

On October 3, 2016, the Board met, reviewed a list of eighteen potential acquirers, and directed McMullen to solicit proposals from investment banks and create an internal cash flow model to value the company.[26] Additionally, Brent Wadman, Stillwater's General Counsel, recommended that the Board form a special committee to oversee the sale process. Since the July 2016 meeting between

---

[20] *Stillwater Mining*, 2019 WL 3943851, at *7.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.* at *7-8.
[25] *Id.* at *8; B40-41; B1095-96.
[26] *Stillwater Mining*, 2019 WL 3943851, at *8-9.

McMullen and Sibanye, Wadman had become concerned that McMullen was rushing the sale process to facilitate his exit from the company.[27] The Board sought the advice of external counsel, Holland & Hart LLP, as to whether any conflicts existed and whether a special committee should be formed.[28] With Holland & Hart LLP's advice, the Board determined that no conflicts of interest existed at that time.[29] The Board formally retained BAML on November 7, 2016, and BAML immediately conducted a market check.[30] On November 11, 2016, the Board retained Jones Day for its "substantial experience in advising Delaware publicly traded companies in respect of potential strategic transactions."[31]

By the next Board meeting on November 23, 2016, twenty-four parties had received some type of formal or informal contact from BAML or Stillwater management. Four of those parties accessed the data room, four conducted site visits, and one, Sibanye, submitted an indication of interest.[32] McMullen informed the Board that he viewed Sibanye's initial offer of $15.75 per share as insufficient.[33] At the Board's direction, BAML reached out to additional parties, and one, Northam,

---

[27] *Id.* at *9.
[28] *Id.*
[29] *Id.*
[30] *Id.* at *10.
[31] *Id.*
[32] *Id.* at *11-12.
[33] *Id.* at *12.

signed a non-disclosure agreement and accessed the data room.[34]  Two other parties—Northern Star and Independence—informed Stillwater that they were only interested in a merger of equals.[35]

On December 1, 2016, Sibanye revised its offer to $17.50-$17.75 per share in cash.[36]  On December 2, 2016, Stillwater's Board rejected the revised offer.[37]  That same day, BAML provided its internal discounted cash flow model valuing the company between $10.78 and $14.14 per share.[38]  BAML also provided a financial analysis of the two merger of equals proposals from Northern Star and Independence.[39]  After reviewing the financial analysis, the Board ultimately determined not to pursue either merger of equals transaction, finding neither tenable for a number of reasons.[40]

On December 3, 2016, Sibanye made its "best and final" offer of $18 per share to acquire Stillwater.[41]  The $18 price represented a 22.6% premium over the unaffected trading price and a 24.4% premium over the 30-day volume-weighted average price.[42]  At this point, although five parties had signed nondisclosure

---

[34] *Id.* at *13.
[35] *Id.* at *12.
[36] *Id.* at *13.
[37] *Id.* at *13-14.
[38] *Id.* at *14.
[39] *Id.*
[40] *Id.*
[41] *Id.* at *15.
[42] *Id.* at *16.

agreements and gained access to Stillwater's non-public information, Sibanye was the only party to make a bid.[43]

### C. Stillwater Signs with Sibanye

On December 8, 2016, BAML provided an opinion to the Board that Sibanye's offer was fair to stockholders.[44] The Board considered BAML's fairness opinion in its deliberations, approved the merger, and signed the merger agreement.[45] The transaction was publicly announced on December 9, 2016.[46]

In March 2017, Wadman resigned as general counsel. Wadman's resignation letter cited his concerns about how the deal process unfolded and his belief that McMullen used the process to engage in self-dealing.[47] Stillwater negotiated a settlement with Wadman, and the company issued a statement that did not mention the reasons for his resignation.[48]

During the 138 days between the signing and the stockholder vote, no other bidder made a topping bid over $18 per share, but the price of palladium and Stillwater's trading price increased during that time.[49] Still, on April 26, 2017,

---

[43] *Id.* at *15.
[44] *Id.*
[45] *Id.* at *15-16.
[46] *Id.* at *16.
[47] *Id.* at *17.
[48] *Id.*
[49] *Id.*

approximately 75% of the issued outstanding shares eligible to vote approved the merger.[50]  On May 4, 2017, the sale of Stillwater to Sibanye closed.[51]

### D. Appraisal Litigation

On May 22, 2017, appellants, petitioners-below, initiated this appraisal litigation.[52]  The Court of Chancery conducted a four-day trial and held post-trial argument on May 1, 2019.

On August 21, 2019, the court issued its Memorandum Opinion.[53]  The Court of Chancery held that "Sibanye proved that the sale process was sufficiently reliable to make the deal price a persuasive indicator of fair value."[54]  Further, the court stated that while "[t]he evidence demonstrated that Stillwater's trading price could provide a persuasive indicator of value, . . . it was a less persuasive indicator than the deal price."[55]  It also held that "[n]either side proved that its DCF valuation provided a persuasive indicator of fair value.  The experts disagreed over too many inputs, and the resulting valuation swings were too great, for [the court] to rely on a model when a market-tested indicator is available."[56]  Thus, the court deferred to the merger price

---

[50] *Id.*
[51] *Id.*
[52] *Id.* at *17.
[53] *Id.* at *1.
[54] *Id.*
[55] *Id.*
[56] *Id.*

of $18 per share as the most reliable indicator of Stillwater's fair value.[57] It also declined to make an upward adjustment to the price to account for Stillwater's increase in value after signing, holding that petitioners did not prove that they were entitled to a deal price adjustment.[58] On September 27, 2019, the Court of Chancery entered its Post-Trial Judgment order.

### E. Petitioners Appeal the Court's Memorandum Opinion and Order

On October 8, 2019, Petitioners filed a timely Notice of Appeal. On appeal, Petitioners argue that the Court of Chancery abused its discretion by ignoring the flawed sale process and holding that the deal price of $18 per share reflected Stillwater's fair value at closing.[59] Further, Petitioners argue that the court relied on an incorrect conclusion to justify its decision to not adjust the deal price upward to account for rising commodity prices.[60]

Sibanye responds that the Court of Chancery correctly examined Stillwater's sale process and held that the process presented sufficient indicia of reliability, making the deal price the best indicator of Stillwater's fair value.[61] Further, it argues that because Petitioners' arguments concerning the deal price adjustment were wholly conclusory, the court correctly held that Petitioners "failed to prove . . . 'that

---

[57] *Id.*
[58] *Id.* at *50.
[59] Opening Br. 38-40.
[60] *Id.* at 26.
[61] Answering Br. 18-20.

11

the deal price should be adjusted upward to reflect a change in value between signing and closing.'"[62]

On review, this Court holds that the Court of Chancery did not abuse its discretion when it relied on the deal price as the most reliable indicator of Stillwater's fair value. Nor did the Court abuse its discretion when it declined to adjust the deal price.

## II. STANDARD OF REVIEW

This Court reviews errors of law *de novo*.[63] We review statutory appraisal awards for abuse of discretion and "grant significant deference to the factual findings of the trial court."[64] "So long as the Court of Chancery has committed no legal error, its factual findings will not be set aside on appeal unless they are clearly wrong and the doing of justice requires their overturn."[65] "We defer to the trial court's fair value determination if it has a 'reasonable basis in the record and in accepted financial principles relevant to determining the value of corporations and their stock.'"[66]

---

[62] *Id.* at 29 (quoting *Stillwater Mining*, 2019 WL 3943851, at *50).

[63] *SmithKline Beecham Pharms. Co. v. Merck & Co.*, 766 A.2d 442, 447 (Del. 2000).

[64] *DFC Glob. Corp. v. Muirfield Value P'rs*, 172 A.3d 346, 363 (Del. 2017).

[65] *Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 219 (Del. 2005).

[66] *Dell, Inc. v. Magnetar Glob. Event Driven Master Fund Ltd.*, 177 A.3d 1, 5-6 (Del. 2017) (quoting *DFC*, 172 A.3d at 348-49).

## III. ANALYSIS

Under 8 *Del. C.* § 262(a), a dissenting stockholder to a merger "shall be entitled to an appraisal by the Court of Chancery of the fair value of the stockholder's shares of stock." In an appraisal proceeding, the Court of Chancery must "determine the fair value of the shares exclusive of any element of value arising from the accomplishment or expectation of the merger or consolidation, together with interest, . . . to be paid upon the amount determined to be the fair value."[67] "To reach this per-share valuation, the court should first envisage the entire pre-merger company as a 'going concern,' as a standalone entity, and assess its value [on the closing date of the merger] as such."[68] "Then, once this total standalone value is determined, the court awards each petitioning stockholder his pro rata portion of this total—his proportionate interest in [the] going concern plus interest."[69]

When determining a company's fair value in an appraisal, "the Court shall take into account all relevant factors."[70] Although "[t]he value of a corporation is not a point on a line, but [instead] a range of reasonable values," the court must "assign one particular value within this range as the most reasonable value in light

---

[67] 8 *Del. C.* § 262(h).
[68] *Dell*, 177 A.3d at 20.
[69] *Id.* at 21 (citations and internal quotation marks omitted).
[70] 8 *Del. C.* § 262(h).

of all the relevant evidence and based on considerations of fairness."[71] "In discharging its statutory mandate, the Court of Chancery has discretion to select one of the parties' valuation models as its general framework or to fashion its own."[72] But, "[i]n the end, the trial judge must determine fair value, and 'fair value is just that, "fair." It does not mean the highest possible price that a company might have sold for.'"[73]

## A. The Court of Chancery Did Not Abuse its Discretion when it Held that the Deal Price was the Best Evidence of Stillwater's Fair Value

Petitioners first argue that "[t]he court below erroneously concluded that the flawed sale[] process was sufficient to defer completely to merger price."[74] Petitioners allege that instead of analyzing the actual merger process in accordance with this Court's precedent, the Court of Chancery "constructed a made-up deal process—involving only a single bidder—to speculate that if this Court would defer completely to merger price in that (more extreme) scenario, it would likely uphold a merger-price determination here, despite the significant process deficiencies."[75] Thus, Petitioners contend that the Court of Chancery disregarded "the facts of this

---

[71] *Cede & Co. v. Technicolor, Inc.*, 2003 WL 23700218, at *2 (Del. Ch. Dec. 31, 2003, revised July 9, 2004), *aff'd in part, rev'd in part on other grounds*, 884 A.2d 26 (Del. 2005).

[72] *M.G. Bancorp., Inc. v. Le Beau*, 737 A.2d 513, 525-26 (Del. 1999).

[73] *Fir Tree Value Master Fund, LP v. Jarden Corp.*, 2020 WL 3885166, at *7 (Del. Jul. 9, 2020) (quoting *DFC*, 172 A.3d at 370) (citing *Dell*, 177 A.3d at 20).

[74] Opening Br. 5.

[75] *Id.* at 37.

case" and "failed to analyze the sale[] process for Stillwater to determine whether it provided reliable evidence of third-party market valuation."[76]

Here, contrary to Petitioners' representations, the Court of Chancery examined Stillwater's sale process, explained its reasoning, and grounded its conclusions in the relevant facts and law. The court dedicated 56 pages of its 139-page decision to examining the reliability of the deal price. The court walked through each step of the sale process, found that there were objective indicia of reliability, and addressed each of Petitioners' arguments concerning alleged defects in the pre- and post-signing phases. After conducting this analysis, the court held that although Stillwater's sale was "rough and ready," "given the arm's-length nature of the Merger, the premium over market, and the substance of what took place during the sale process, it is not possible to say that an award at the deal price would result in the petitioners being exploited."[77] This Court cannot hold that the Court of Chancery abused its discretion in reaching this conclusion based on the record before us.

**1. The Court of Chancery determined that the sale process provided objective indicia of reliability**

This Court has recently examined instances when sale processes provided persuasive evidence of fair value. In *DFC*, *Dell*, and *Verition Partners Master Fund*

---

[76] *Id.*
[77] *Stillwater Mining*, 2019 WL 3943851, at *44.

*Ltd. v. Aruba Networks, Inc.*,[78] this Court looked to objective factors that bolstered the reliability of the sale process and gave considerable weight to the deal price. In *DFC*, this Court considered a sale process where

> i) the transaction resulted from a robust market search that lasted approximately two years in which financial and strategic buyers had an open opportunity to buy without inhibition of deal protections; ii) the company was purchased by a third party in an arm's length sale; and iii) there was no hint of self-interest that compromised the market check.[79]

This Court concluded that "the best evidence of fair value was the deal price, as it resulted from an open process, informed by robust public information, and easy access to deeper, non-public information, in which many parties with an incentive to make a profit had a chance to bid."[80] In so holding, this Court noted that the

> refusal to craft a statutory presumption in favor of the deal price when certain conditions pertain does not in any way signal [this Court's] ignorance to the economic reality that the sale value resulting from a robust market check will often be the most reliable evidence of fair value, and that second-guessing the value arrived upon by the collective views of many sophisticated parties with a real stake in the matter is hazardous.[81]

---

[78] 210 A.3d 128, 135 (Del. 2019).
[79] 172 A.3d at 349.
[80] *Id.*
[81] *Id.* at 366.

Likewise, in *Dell*, this Court determined that the deal price deserved deference when "Dell's sale process bore many of the same objective indicia of reliability" present in *DFC*.[82] Specifically, this Court reasoned that

> when the evidence of market efficiency, fair play, low barriers to entry, outreach to all logical buyers, and the chance for any topping bidder to have the support of Mr. Dell's own votes is so compelling, then failure to give the resulting price heavy weight . . . abuses even the wide discretion afforded the Court of Chancery in these difficult cases.[83]

Thus, this Court in *Dell* held that, due to the objective indicia of reliability, "the deal price deserved heavy, if not dispositive, weight."[84]

Finally, in *Aruba* this Court noted "the long history of giving important weight to market-tested deal prices in the Court of Chancery and this Court"[85] and underscored that "a buyer in possession of material nonpublic information about the seller is in a strong position (and is uniquely incentivized) to properly value the seller when agreeing to buy the company at a particular deal price."[86] The Court concluded that the buyer's "view of value should be given considerable weight by the Court of

---

[82] *Dell*, 177 A.3d at 28.

[83] *Id.* at 35.

[84] *Id.* at 23.

[85] *Verition P'rs Master Fund Ltd. v. Aruba Networks, Inc.*, 210 A.3d 128, 135 (Del. 2019); *see also id.* at 135 n.41 (collecting cases).

[86] *Id.* at 137.

Chancery absent deficiencies in the deal process" because the buyer had access to nonpublic information and was able and incentivized to properly value the target.[87]

Using the above decisions as guidance, the Court of Chancery examined Stillwater's sale process and determined that it also presented "'objective indicia' that 'suggest[ed] that the deal price was a fair price.'"[88] The court highlighted five key objective indicators that supported the reliability of Stillwater's sale process: (1) "the Merger was an arm's length transaction with a third party"; (2) "the Board did not labor under any conflicts of interest"; (3) the buyer "conducted due diligence and received confidential information about Stillwater's value"; (4) Stillwater "negotiated . . . multiple price increases"; and (5) "no bidders emerged during the post-signing phase."[89] This Court has held that each of these indicators reflected a trustworthy process when evaluating the sale processes in *DFC*, *Dell*, and *Aruba*.[90] Although these indicators are fewer indicia of fairness than this Court identified when reviewing the sale processes in *DFC*, *Dell*, or *Aruba*, the court did not abuse

---

[87] *Id.*

[88] *Stillwater Mining*, 2019 WL 3943851, at *22 (quoting *Dell*, 177 A.3d at 28).

[89] *Id.* at *22-23.

[90] *See, e.g.*, *DFC*, 172 A.3d at 349 (noting as persuasive that "the company was purchased by a third party in an arm's length sale"); *Dell*, 177 A.3d at 28 (crediting the deal price because the special committee was "composed of independent, experienced directors and armed with the power to say 'no'" and the special committee "persuaded Silver Lake to raise its bid six times"); *id.* at 33 (finding that absence of higher bid meant "that the deal market was already robust and that a topping bid involved a serious risk of overpayment," which "suggests the price is already at a level that is fair"); *Aruba*, 210 A.3d at 137 (emphasizing that the buyer was armed with "material nonpublic information about the seller is in a strong position (and is uniquely incentivized) to properly value the seller").

18

its discretion by determining that "the objective indicia that were present provide a cogent foundation for relying on the deal price as a persuasive indicator of fair value."[91]

### 2. The Court of Chancery considered and rejected Petitioners' objections to the pre-signing process

Having identified the objective signs that the deal price was a reliable indicator of fair value, the Court of Chancery also addressed and rejected each of Petitioners' several arguments for why the pre-signing process undermined that reliability.[92]

First, the court considered Petitioners' claim that McMullen's role in the pre-signing process and the Board's lack of "meaningful oversight" during that period sullied the reliability of the sale process.[93] The court acknowledged that aspects of the process, including McMullen's early unsupervised activities and the lack of Board involvement until later in the sale discussions, presented "flaws."[94] It held, however, that "[t]hose flaws are factors to consider, but they do not undermine the reliability of the sale price" because BAML's pre-signing canvas, the repeated rejections of Sibanye's offers, and an effective post-signing market check ensured a

---

[91] *Stillwater Mining*, 2019 WL 3943851, at *23.
[92] *Id.* at *23-44.
[93] *Id.* at *30-34.
[94] *Id.* at *31.

sufficient degree of reliability.[95]   Therefore, the suboptimal executive and board involvement early on did "not inherently disqualify the sale process from generating reliable evidence of fair value."[96]

Second, the court held that although McMullen's pursuit of the merger "appears to have been motivated by his desire to maximize his personal wealth and retire," those personal interests did not undermine the sale process.[97]   Instead, the court determined that McMullen's financial and personal interests were aligned with stockholders' desire to maximize the company's value.[98]   And "[w]hen Sibanye indicated interest at $15.75 per share in July 2016, McMullen did not rush to sign up a deal[,]" evidencing his commitment to extract the highest possible price for the company.[99]   Further, the court noted that "McMullen's personal interests as a whole do not appear materially different from interests that have not been sufficient in other cases to undermine the reliability of sale processes."[100]   Thus, McMullen's personal interests did not lead him or the Board "to accept a deal price that left a portion of

---

[95] *Id.* at *44.
[96] *Id.* at *31.
[97] *Id.* at *33.
[98] *Id.* at *34.
[99] *Id.*
[100] *Id.* Specifically, the Court of Chancery compared McMullen's potential conflicts with disputed conflicts addressed by this Court's decisions in *Aruba*, 210 A.3d at 141-42, and *Dell*, 177 A.3d at 32-34. *Stillwater Mining*, 2019 WL 3943851, at *33.

20

Stillwater's fundamental value on the table, particularly in light of the effective post-signing market check that Stillwater conducted."[101]

Third, the court analyzed Stillwater's initial "soft sell" approach and BAML's pre-signing market check. The court determined that although "the 'soft sell' strategy was not an effective means of generating interest in the Company," it "did not do anything to harm either BAML's abbreviated pre-signing process or the post-signing market check."[102] BAML reached out to fourteen parties once it was retained, and seven parties engaged to some degree in the process.[103] While Petitioners "have criticized the timing, pacing, and scope of the pre-signing process, . . . it resulted in BAML contacting the 'logical strategic buyers' before Stillwater signed up its deal with Sibanye."[104] Further, "[t]he number of meaningful contacts compares favorably with or is similar to the facts in the Delaware Supreme Court precedents."[105] Thus, while the "abbreviated pre-signing process was not ideal," the court concluded that it was still "a positive factor for the reliability of the sale process."[106]

---

[101] *Stillwater Mining*, 2019 WL 3943851, at *34.
[102] *Id.*
[103] *Id.* at *35.
[104] *Id.* (quoting *Aruba*, 210 A.3d at 136).
[105] *Id.* (citing *Aruba*, 210 A.3d at 136-39, 142; *Dell*, 177 A.3d at 28; *DFC*, 172 A.3d at 350, 355, 376).
[106] *Id.* at *36.

Fourth, and finally, the court rejected Petitioners' argument that "Sibanye pressured Stillwater to sign a merger agreement before the company's rising stock price made what Sibanye was willing to pay look inadequate."[107] Sibanye conducted due diligence before signing, received access to material non-public information, and was uniquely incentivized to value Stillwater properly. When Sibanye made its final offer of $18 per share, it "could have deployed cash on hand or drawn on its revolving line of credit" to increase that offer if its own valuation supported such an increase; it did not. [108] "That Sibanye did not bid higher does not mean that the price it agreed to pay did not reflect fair value when its bid prevailed."[109] Moreover, Stillwater twice rejected Sibanye's lower offers before accepting a deal for $18 per share. As such, the court held that "[t]he negotiations between Stillwater and Sibanye over price, together with Sibanye's refusal to pay more, provide[] strong evidence of fair value."[110]

Thus, the court considered each of Petitioners' arguments concerning the pre-signing process. This Court is satisfied that the Court of Chancery did not abuse its discretion when it held that the pre-signing process was sufficient to support reliance on the deal price as evidence of fair value.

---

[107] *Id.* at *36, *36-38.
[108] *Id.* at *38.
[109] *Id.*
[110] *Id.*

### 3. The Court of Chancery considered and rejected Petitioners' objections to the post-signing process

The Court of Chancery also considered Petitioners' "relatively few" claims challenging the terms of the Merger Agreement and the Board's decisions during the post-signing period.[111]

Because the market price of palladium increased between signing and closing, Petitioners complained that "the Merger Agreement 'provided no practical way for Stillwater's stockholders to receive that additional value.'"[112]  But the Court of Chancery dismissed those arguments as contradictory to the terms of the contract itself.  According to the court, the Merger Agreement was not designed "to give the stockholders the benefit of a transaction that included the potential upside or downside that would result from changes in the price of palladium after signing.  The Merger Agreement was trying to provide stockholders with the ability to opt for the comparative certainty of deal consideration equal to $18.00 per share."[113]  Moreover, the court held that the challenge to the Merger Agreement failed because Stillwater's stockholders were not wholly barred from capitalizing on rising palladium prices; as a practical matter, "[i]f Stillwater's stockholders had wanted to capture the increased

---

[111] *Id.* at *38.
[112] *Id.*
[113] *Id.* at *39.

value of palladium, then they could have voted down the Merger and kept their shares."[114]

The court also rejected Petitioners' argument that the no solicitation provision and matching rights "deterred interested buyers from making a topping bid."[115] The court compared the deal protections here to the "similar suite of deal protections" in *Aruba* and held that, as in *Aruba* and other cases, these protections "did not preclude or impermissibly impede a post-signing market check."[116] Potential bidders had 138 days to submit a competing bid. "The absence of a higher bid indicates 'that the deal market was already robust and that a topping bid involved a serious risk of overpayment,' which in turn 'suggests the price is already at a level that is fair.'"[117]

Last, the Court of Chancery addressed Petitioners' argument that "the stockholders approved the Merger based on incomplete and misleading information."[118] The court noted that "[t]he disclosure theories about McMullen and Wadman would likely have some merit if the petitioners had done more to articulate them, support them with case law, and explain their relationship to a determination of fair value."[119] Despite the cursory nature of the allegations, the court

---

[114] *Id.*
[115] *Id.*
[116] *Id.* at *41.
[117] *Id.* at *42 (quoting *Dell*, 177 A.3d at 33).
[118] *Id.*
[119] *Id.* at *43.

acknowledged that "the proxy statement should have disclosed McMullen's interest in retiring, his roles with GT Gold and New Chris, and their implications for his employment agreement. Stockholders also should have been told that Wadman resigned because of disputes with senior management about the conduct of the sale process."[120] But, the court was not convinced that Petitioners' arguments were "sufficient to undermine the stockholder vote as an expression of the preference of a supermajority of Stillwater's stockholders for a sale rather than having the Company continue as a standalone entity."[121] Although the disclosures might have "affected stockholders' views about whether their negotiators had extracted the highest possible bid," there would not have been "any reason to revise their assessment of the Company's prospects as a standalone entity or to vote down the Merger in the belief that the Company was more valuable as a going concern in its operative reality as a widely held, publicly traded firm."[122] Nonetheless, the court did "not give heavy weight to the stockholder vote" because of the disclosure issues.[123]

As with the pre-signing arguments, after analyzing and addressing all of Petitioners' post-signing process challenges, the court concluded that "Sibanye

---

[120] *Id.*
[121] *Id.*
[122] *Id.*
[123] *Id.*

proved by a preponderance of the evidence that the sale process made the deal price a persuasive indicator of fair value. The sale process was not perfect, and the petitioners highlighted its flaws, but the facts of this case, when viewed as a whole, compare favorably" with this Court's precedents.[124] On review, given the record before the Court of Chancery, we hold that the court did not abuse its discretion in so holding.

### 4. The Court of Chancery properly based its deal price analysis on the sale process, not on its single-bidder hypothetical

Petitioners do not meaningfully challenge any of the Court of Chancery's specific holdings regarding the objective indicia of reliability. Nor do they meaningfully dispute the court's treatment of any of the specific arguments concerning the pre- and post-signing phases. Instead, Petitioners assert that "[t]he court below failed to analyze the sale[] process" because it "analyzed a hypothetical 'single-bidder' process."[125]

When addressing Petitioners' arguments concerning the lack of outreach to other buyers during the pre-signing phase, the Court of Chancery entertained the question of whether "the deal price [would] provide persuasive evidence of fair value if Stillwater had pursued a single-bidder strategy in which it only interacted with

---

[124] *Id.* at *44.
[125] Opening Br. 37.

Sibanye before signing the Merger Agreement . . . ."[126] The court stated that it believed that "if the proponent of a single-bidder process could show that the merger agreement allowed for a passive post-signing market check in line with what decisions have held is sufficient to satisfy enhanced scrutiny, and if there were no other factors that undermined the sale process, then the deal price would provide persuasive evidence of fair value."[127]

But, contrary to Petitioners' allegations, the court did not ignore the facts pertinent to the actual process. As this Court described above, the Court of Chancery reviewed each step of the sale process before concluding that the deal price was reliable. The entirety of the court's single-bidder discussion encompasses a small portion of its lengthy analysis. Moreover, the court recognized that its analysis was hypothetical and emphasized that it "already found that the sale process exhibited objective indicia of reliability" without relying on the hypothetical.[128] As a result, that portion of the court's analysis was not necessary to its decision, does not alter its holding in this case, and is not being considered on appeal.

---

[126] *Stillwater Mining*, 2019 WL 3943851, at *24.

[127] *Id.* at *30.

[128] *Id.* The court also clarified "I am not suggesting that the Delaware Supreme Court has ever endorsed a single-bidder process for purposes of appraisal, nor that any of the precedents that this decision has discussed are squarely on point. Nor am I claiming to have any privileged insight into how the Delaware Supreme Court would or should evaluate the persuasiveness of a single-bidder strategy on the facts of any particular case." *Id.*

"What is necessary in any particular case . . . is for the Court of Chancery to explain its [analysis] in a manner that is grounded in the record before it."[129]  Here, the Court of Chancery thoroughly analyzed the facts surrounding Stillwater's sale process in accordance with this Court's precedent.  Absent any sign that the court abused its statutory mandate, this Court will not second-guess the court's careful examination of Stillwater's sale process.  Therefore, we hold that the Court of Chancery did not abuse its discretion when it held that the deal price was a reliable indicator of Stillwater's fair value.

**B. The Court of Chancery Did Not Abuse its Discretion when it Declined to Grant a Deal Price Adjustment**

Next, Petitioners argue that the Court of Chancery abused its discretion when it declined to adjust the deal price upward to reflect the rising commodity prices between signing and closing.  They argue that "[t]he trial court, while recognizing the undisputed increase in Stillwater's value between signing and closing, refused to award such accretion . . . ."[130]  Moreover, according to Petitioners, the court wholly based its decision to not adjust the deal price on its erroneous conclusion that "Petitioners had not argued for such an adjustment."[131]

---

[129] *DFC*, 172 A.3d at 388.
[130] Opening Br. 24.
[131] *Id.*

"In a statutory appraisal proceeding, both sides have the burden of proving their respective valuation positions . . . ."[132] Therefore, in an appraisal proceeding, the party seeking an adjustment to the deal price reflecting a valuation change between signing and closing bears the burden to identify that change and prove the amount to be adjusted.[133] The time for determining the value of a dissenter's shares is the date on which the merger closes.[134] Thus, if the value of the corporation changes between the signing of the merger agreement and the closing, then the fair value determination must be measured by the "operative reality" of the corporation at the time of the merger.[135]

A holistic review of the court's analysis suggests that it was unconvinced by Petitioners' conclusory arguments for an adjustment to the deal price and declined to grant the adjustment because Petitioners failed to meet their burden of proof.[136] While Petitioners seize on the court's language that "the petitioners never argued for an adjustment to the deal price,"[137] this reading ignores the court's analysis of numerous difficult considerations that Petitioners failed to adequately address. The

---

[132] *M.G. Bancorp., Inc. v. Le Beau*, 737 A.2d 513, 520 (Del. 1999).

[133] *See In re Appraisal of Columbia Pipeline Gp.*, 2019 WL 3778370, at *45 (Del. Ch. Aug. 12, 2019) ("The petitioners contend that Columbia's value increased during this period. As the party arguing for an upward adjustment to the deal price, the petitioners bore the burden of proof on this issue.").

[134] *Cede & Co. v. Technicolor, Inc.*, 684 A.2d 289, 298 (Del. 1996).

[135] *Id.*

[136] *Stillwater Mining*, 2019 WL 3943851, at *48.

[137] *Id.*

court's statement that petitioners did not argue for an adjustment to the deal price may have been inartful, but it appears that the court also considered and rejected the notion of a deal price adjustment based on gaps in Petitioners' arguments.

## IV. CONCLUSION

Based on the foregoing, the Court of Chancery's August 21, 2019 Memorandum Opinion and September 27, 2019 Post-Trial Judgment order are AFFIRMED.